Peelle, J.,
delivered the opinion of the court:
This action is prosecuted under the following special act of Congress:
“Be it enacted by the Senate a/nd House of Representatives of the United States of America im Congress assembled, That *495 the claim of Charles Murphj" be remanded to the Court of Claims for a further hearing upon the testimony and papers formerly heard in-said court, and upon such further testimony, including the claimant’s evidence, as either party may file, pursuant to the rules of the court; in addition to the authority conferred upon it by existing laws, it shall have equitable jurisdiction of all matters presented by the claimant in his new petition, to be filed within sixty days from the approval of this act; and said court is authorized and directed speedily to render judgment for such amount as right and justice may demand, without reference to any statutes of limitation. And, furthermore, an appeal shall lie from such judgment to the Supreme Court of the United States by either party upon the entire record considered in the Court of Claims.
“Approved July 25, 1890.”
As the act provides for an appeal to the Supreme Court “by either party upon the entire record considered in the Court of Claims,” it will be unnecessary for us to find the facts formally; but so far as material to the case, as we view it, the history and facts are substantially as follows:
In Juno, 1813, the defendants, through their agent, the commandant of the nav3r-yard at Mare Island, Cal., advertised for sealed proposals for excavating for the site of the dry dock at said navy-yard about 90,000 cubic yards of material, subsequently estimated at about 95,000 cubic yards, the contractor to “furnish all necessary teams, carts, tools, labor, materials, and everything necessary for excavating and for shoring the pit for the said dry dock,” and to “execute the work in such order and manner and deposit the earth excavated at such point or points on the island as may be directed by the civil engineer in charge of the work.” The advertisement further provided that “the cost of drainage while the excavation is in progress will be borne by the Government.”
Bidders were therein requested to name the time in which they would complete the work, accompanying their bids ‘ ‘ with the certificate of two guarantors, who will become responsible, each in the sum of $20,000, for the execution of the work if awarded to the said bidders.”
In response to the advertisement thus made the claimant’s decedent, under date of June 28,1873, made his bid, whereby he proposed to do the work according to plans and specifications for the sum of 74 cents per cubic yard, and to “com- *496 pleto said work in ono hundred and twenty days from date of contract.”
The bid so made was accepted, and thereafter, July 18,1873, a contract was entered into, which, together with the advertisement aforesaid and the plans and specifications made a part thereof, are referred to and made part of the petition herein-, whereby the decedent, among other things, agreed that in consideration of the payment to him by the Government of “seventy-four (74) cents United States currency for each and every cubic yard of material excavated” and “measured in the excavation, and six dollars and eighty-seven and a half cents ($6.874-) United States currency for each and every linear foot of tunneling performed,” he would furnish at his “own cost and expense all the labor, materials, teams, provender, implements, and tools of every description required, and within ten days from the signing of the contract to undertake, with a force of not less than ten horses and carts (with the required workmen) or an equivalent thereto, the work of excavating, tunneling, and shoring on the site of the stone dry dock now in course of building in the said navy-yard, the said work to bo vigorously carried on and completed according to the accompanying specifications which form a part of this-contract, and to the drawings of the said dry dock as they may bo furnished from time to time by the superintendent thereof.”
It was further provided therein “that the said party of the • second part to be at liberty to make any deviation from or alteration in the plan, form, construction, detail, and execution described by the drawings and specifications, without invalidating or rendering void the contract,” and that upon receiving a written order from the superintendent for that purpose, the claimant agreed to “suspend the working and proceeding with such part or portions of work, to be specified in such order for the due and proper execution of other work or works connected therewith, and in case of inclemency of weather, and for the prevention, as far as possible (of damage), from the flow of rainfall or surface water into the excavation, he shall cause suitable ditches to be cut for the purpose of leading said water away from the works.”
For all the work aforesaid the decedent agreed to complete *497 the same “within one hundred and twenty days from the date of the contract;” and he further agreed that for “each and every day, Sundays and holidays only excepted, that the said works may remain incomplete and unfinished beyond the time herein stipulated for its completion ” the defendants might “ deduct and retain out of any money which may become due to the party of the first part the sum of one hundred dollars ($100) per day.”
The payment for said work was to be made in the manner therein provided for, and in case the contractor “shall fail to perform all or any of the covenants herein provided to be performed” the Navy Department “shall have the power to annul the contract without loss or damage to the Government,” and that in case of such failure “ or in completing the said work at the time specified, the said Department shall have the power to enter upon and complete the said, work at the expense of the said parties of the first part. ”
The specifications for the work were as follows:
“For excmating the site of the dry dock now being constructed at the nmy-ya/rd, Mare Island, California, and general conditions on which the work is to be executed.
“1. The whole of the ground within the limits of the.proposed dock and as may be necessary for- its working space, roads, etc., must be taken out to the required widths and depths as may be directed by the civil engineer in charge, and in the order to be prescribed by him.
“2. The bottom of the trenches' or cuttings must be carefully leveled and formed to receive the masonry, or whatever work may be required to be placed therein. All roadways or approaches, and' all spaces or areas to be left around the dock, and which may require to be excavated under this contract, must be carefully graded to such grades as the superintending engineer may direct.
“3. The sides of the excavation must be shored and timbered in such manner as the contractor may think right and on his own responsibility, or slopes may be formed for reducing the quantity of timber shoring and side planking, but the excavation to the widths and depths shown on the drawing, or as may be required by the masonry of the dock, will only be paid for.
“4. The sufficiency of the shoring, timbering, and of all the means employed by the contractor for the excavation of the earthwork must rest with him, and he must take all the *498 responsibility of all failures from whatever cause arising, immediately remedying them at his own cost.
“5. The soil excavated or dredged from the site of the work must be removed and deposited at such point or points on the navy-yard as may be directed by the superintending engineer, and in such manner and order and at such grades as he may prescribe. The contractor is to reserve such excavated material as the superintending engineer shall deem suitable for puddling and filling the cofferdam, and shall deposit the same therein, carefully preparing'the said material for this portion of the work and placing it in the dam as he may be directed. In like manner he shall reserve suitable material for the embankment within the enclosure of the cofferdam, and deposit the same as he may be directed by the superintending engineer.
“6. In case tunneling shall be required for the'drainage culverts of the dock, the contractor is to perform the same according to the forms and dimensions as laid down on the drawings, and so as to admit of the proper construction of the masonry of said culverts. Wherever necessary, he is to provide suitable materials and perform all the work required for timbering or shoring said tunnels. The excavated material from the tunnels is to be disposed of in the same general manner as prescribed for the above-mentioned portion of the dock.
“ 7. All timber, clay, and other materials used by the contractor for dams and other temporary purposes connected with the excavation and the tunneling must be removed by him at his own cost and charge, but no shoring or timbering-necessary to sustain the banks or tunnel shall be removed by him without written authority from the superintending engineer of the works.
“ 8. The expense of dams, ditches, and the means of leading water to the draining wells must be borne by the contractor, as far as the draining of his own work is concerned, but the Government is to provide and maintain the operation of all pumping machinery necessary for the drainage of the works at its own cost and expense.
“ 9. All the labor, materials, teams, provender, implements, and tools of every description necessary for the excavation and tunneling of the said works and shoring and timbering the same, including all the necessary means for removing, depositing, and grading the excavated materials, excepting the pumping machinery and its maintenance as aforesaid, are to be provided by the contractor at his own cost and charge.
“ 10. The excavation will be paid for at the stipulated contract price per cubic yard, measured in the cuts, and will *499 include all removal, depositing, filling, and grading of the materials and all the work connected',therewith. The tunneling, including all shoring, timbering, and removal of material, filling, and grading with the same will be paid for at the stipulated contract price per lineal foot.
“The above is subject to any changes that may be madebj^ the Bureau of Yards and Docks before the award of contract.”
Under the contract thus made the claimant’s decedent, on the 22d day of July, 1873, entered upon its execution.
Prior to the date of the contract the defendants had excavated for said dry dock about 18,900 cubic yards. The excavation was to be about 500 feet longr and about 130 feet wide and about 36 feet deep, about two-thirds of which was to be in solid ground and the remainder below high-water mark. The excavation so made by the defendants was at the head or west end of the dock in solid ground.
The dock was subsequently enlarged, but not until after the claimant had ceased work. The eastern part, or about one-half of the excavation to be done, was covered with tide water and a cofferdam was necessary -to keep the water out. Such a dam had been planned by the defendants, and work thereon had begun prior to the date of the contract herein, the defendants at that time having driven about 1,300 piles in the dam and filled in a portion of the materials excavated by them. There were still about 120 piles to be driven. The puddling which had been put in between the piles so driven was not sufficient to keep the water out, and the tide flowed in and out between the piles over about one-half or a little more of the site of the proposed dry dock.
Before the water could be excluded it was necessary to put the remaining piles in place, so that the puddling could be put in and securely packed between the rows of piles in order to exclude the tide, all of which was known to the decedent when he entered into the contract.
The dam so constructed was not completed until about the 1st day of December, 1873, and was then weak and insecure and not sufficient to stand the pressure when the dock pit should be completed, nor was it sufficient.to exclude the tide water during the period within which the claimant had contracted to complete said work. In January and February, 1874, the defendants made diligent efforts to strengthen the *500 dam by driving additional piles both in rows and in clusters, the latter being- held together by strong iron bands, but they failed to provide the machinery necessary to pump the water out of the pit, by reason of which the decedent was unable to perform his contract within the time therein provided, as he could have done had the proposed site been kept free from water as the defendants had agreed it should be; and if they had done so, he would thereby have avoided the rainy season ■ which set in the latter part of November, 1873, greatly retarding the work so that he was able to work but six days during December, 1873, and January and February, 1874. The rain ceased in March, when the work was resumed with as large a force as could well be employed until June following, when about half of the claimant’s force of men for some reason left him and engaged in other woi’k, but their places were in the main soon thereafter supplied and work continued, but not to the satisfaction of the defendants, and for that reason the contract was on September 5, 1874, annulled.
The average force employed on the work during the year 1874 was greater than that employed in 1873, and at the date the contract was annulled the decedent had employed about 63 men and about 25 horses and mules.
He protested at the time to the annulment of his contract and proposed to give bond to complete the work within sixty days from that date, but his offer was refused. At the time of the annulment of said contract there remained to be excavated about 20,266 cubic yards.
During the progress of the work, to wit, after May 15,1874, the decedent was forbidden to use gunpowder to loosen the earth, which was essential to lessen the expense of excavation, though at the time the contract was entered into it was customary to use gunpowder in such works and nothing was said in the contract concerning the same.
He was required to dump the material excavated by him at a place about 1,500 feet from the site of excavation over marsh land and mud flats which at high tide was covered with water, although another contractor was permitted to dump material excavated by him on solid ground in the immediate vicinity of the dock. This requirement of the defendants to dump the material remote from the dock, though subject to *501 the direction of the engineer in, charge, was contrary to the reasonable expectation of the decedent at the time of the contract, as prior thereto the defendants had damped the material excavated by them not used in the cofferdam on solid ground. He was also required to perform extra work in extending the head of the pit.
The decedent excavated 62,907 cubic yards of material, for which he was paid 74 cents per cubic yard, or 146,551.18, in which was included all the retained percentages due, no forfeitures having been declared against him for failure to complete the work within the time specified in the contract.
Thereafter he presented to the Secretary of the Navy a claim for additional compensation growing out of said contract and the acts of the defendants, substantially as follows:
1. For excavating 15,000 cubic yards of slides, at 74 cents per yard. $11,100
2. For extra labor and expense by being prohibited the use of gunpowder in blasting. 17, 848
3. For difference in place of dumping earth from pit. 6,500
4. For filling north wing of dam.'. 350
5. For extra expense in extending head of pit. 1,500
6. For delays by Government to exclude tide water, in limiting place of working to less than whole site, and other obstructions . 20,000
Total claim. 57,294
The claim so filed was referred to A. W. Von Schmidt, consulting engineer at the Mare Island Navy-Yard, who on July 13, 1875, made a report to the Chief of the Bureau of Yards and Docks of the Navy Department recommending that the decedent be paid for excavating and removing 9,493 cubic yards of slides from the pit of the dry dock, making no recommendation as to the remaining items of the claim.
The Secretary of the Navy approved his report, and the decedent was thereafter paid the contract price of 74 cents per cubic yard, amounting to §7,024.
In November, 1876, the Secretary of the Navy referred the remaining items of the claim to Admiral Rodgers, commandant of the Mare Island Navy-Yard, for his “personal consideration and determination whether an allowance should be made upon them; and if so, what the allowance should be.”
*502 In referring the claim tbe Seer etaiy said:
“In making said reference tbe Department thinks it right to declare the principles which should govern the case upon the points referred to you.
“First. It seems clear that if by the terms or fair implications of the contract, or, if not considered in the contract, if by the circumstances of the case and the understanding of the parties, it was agreed or understood, or necessarily or fairly implied, that the United States was to exclude the tide water and keep it excluded from the work, that this was a condition precedent on the part of the Government, and that the time limiting the completion of the claimant’s contract did not commence to run against him until this condition precedent was fulfilled, and that any expense, costs, or losses incurred by the claimant, by reason of the delay on the part of the Government to fulfill such conditions precedent, should be equitably adjusted and allowed him.
‘ ‘ Second. That if the use of powder was an ordinary, cheap, and convenient mode of making the excavations contracted for, and was used on ordinary occasions for that purpose, and its use was not restricted by the terms or implications of the contract, carefully drawn and particular in its restrictions upon the claimant, that then he should not for the benefit of the Government be deprived of the use of this ordinary and cheap means of fulfilling his contract, and driven to other and more expensive means without proper allowance being made him for such additional expense.
“Third. That while the contract requires that the contractor should deposit the material excavated at such place within the navy-yard as should be designated by the engineer in charge, that this condition must be subject to a reasonable construction, and that the contractor should not be required to deposit the material over or through intervening obstacles which would render this deposit either impossible or ruinous or more expensive than ordinary transportation, as, for instance, across intervening waters or through and on the farther side of a pit or soft mud flat which was to be filled up.”
Admiral Rodgers, after examining the claim, allowed on the items thereof as follows:
For filling north wing of dam. §350.00
For delay, expenses incident to the Government not building dam__ 2,000.00
Dumping material remote from place of excavation in marsh land. 2,835.00
Delay incident to track being out of order at the place of dumping. 500.00
Total. 5,685.00
*503 Thereafter, March 9, 1877 the decedent was paid the amount so awarded, for which he gave a receipt in full in these words:
“Navy Paymaster’s Office, “Wash., D. O., Mar. 9, 1877.
“Received of W. W. Williams, paymaster, U. S. N., fifty-six hund. and eighty-five dollars, in full of the above bill.
“Charles Murphy.”
Soon thereafter he commenced an action in this court, and in his petition, among other things, averred:
That he executed the contract as before stated and was ready To enter upon its execution within the time therein prescribed, and was anxious to do so in order to -complete the work of excavating the pit for the dry dock before the rainy season set in; that the officers of the defendants in charge of the work did not put the claimant into possession of the site to be excavated so as to enable him to complete the work within the time specified in the contract,.but he was- limited to a small portion of the premises at a time greatly to the claimant’s disadvantage, by reason of which the completion of the work was delayed until after the rainy season set in, which was usually the latter part of November; that the pit in which the work was to be done was not kept free from the waters of the Bay of Napa, near where the work was to be done, as it should have been, by the defendants; that after a time he was not allowed to use gunpowder in blasting, which was necessary to facilitate the work, but was compelled by the defendant’s officers to use picks in excavating, which was more tedious and expensive; that he was compelled to transport and dump the material excavated a long distance from the place of excavation, over marshy ground and at great expense, although there was plenty of room to do so within a reasonable distance; that he had the necessary machinery, horses, mules, and implements to perform the work within the time mentioned in the contract, and would have done so but for the acts of the defendants’ officers, as aforesaid; that he did excavate 62,907 cubic yards of material; that in the prosecution of the work he was compelled to remove 15,000 cubic 3rards of earth in addition thereto, made necessary by reason of the severity of the winter rains saturating the banks *504 and by the swelling of the bottom of the pit, which displaced the beams used for shoring, and by the undermining of the banks by orders of the authorities, all of which caused large bodies of earth to slide into the pit without petitioner’s fault. That by reason of the acts aforesaid and the exactions of the defendants’ officers, against which he protested, his credit was injured, his property levied upon by the sheriff of the county and sold at ruinous prices to satisfy debts contracted by him in the purchase of materials and in the emplojunent of labor to carry on said work.
That in view of the premises he is justly entitled to compensation therefor and states his whole claim as follows:
For excavating 62,907 cubic yards, at 74 cents per yard. $46,561
For excavating 15,000 cubic yards, at 74 cents per yard of slides.. 11,100
For constructing dam. 350
For extra labor and expense by being prohibited the use of gunpowder in blasting. 17,848
For difference in place of dumping earth from pit.. 6, 500
For filling north wing of dam. 350
For extra expense in extending head of pit. 1, 500
For delays by Government to exclude tide water, in limiting place of working to less than whole site, and other obstructions. 20,000
For damages, loss of time, expenses, and for losses on property as above. 45,000'
Total. 149,199
And your petitioner further represents that upon application to the proper authorities of the United States Government he was by them paid (after long and unnecessary delays, imposing on him heavy expenses), on account as follows, to wit:
For excavating 62,907 cubic yards, at 74 cents per yard. $46,551
For excavating 9,493 cubic yards, at 74 cents per yards slides.... 7,024
For constructing dam. 350
For extra transportation of earth to place of dumping. 2, 835
For injuries to railroad track at place of dumping. 500
For neglect to build dam to keep out tide water. 2,000
Total paid... 59,260
Upon the findings of fact then made the court held in substance (14 C. Cls., 508) that the disputed items of the claim so presented to the Navy Department had been investigated bjr Admiral Rodgers and an award had been made thereon for $5,685, which was in the nature of an accord and satisfaction, and, having been accepted by the decedent and receipted for in full, the door of litigation was closed.
*505 As to the item of the claim for $45,000 damages, loss of time, expenses, and for loss of property, the court said:
“The seventh item of the claimant’s demands was not included in the settlement. It is a drag-net item, without details, aggregating $45,000. The claimant’s brief furnishes no further light upon it; but in his requests for findings his claims swell to the following..astounding dimensions:
Loss on excavations prior to December 9, 1873, by reason of limited space. $7,279.20
Loss by reason of inability to use plows... 59,851.20
Loss by reason of extra expense in dumping. 73,196,40
Extra cost of excavations between December 9 and May 9.. 15,866.34
Extra cost of excavations after May 15, 1874.:. 65,188. 00
Extra work at pit-head. 4,094.37
Extra work in the slides beyond what has been paid for- 21,074.46
Loss in sale of claimant’s land. 18, 800.00
Loss in sale of claimant’s machinery. 15, 385.00
Loss by idleness in 1873-74.. 2,390.50
Total. 283,125.47”
The decedent filed a motion for a new trial, based on the ground, principally, that at the time of the acceptance by him of the sum of $5,685, for which he gave his receipt in full, the same was not accepted or intended to be accepted by him in full satisfaction of his claim; and while the facts set forth in the affidavits filed in support of his motion were held not to be sufficient to entitle him to á new tidal of the whole case, 3ret they did appeal to the court’s sense of justice and gave good grounds for a rehearing on the one point stated.
Hence the judgment was set aside and the findings also, so far as essential,- and either party was permitted to furnish additional proof touching the circumstances under which said sum of $5,685 had been paid. (15 O. Cls. R., 217.)
Soon thereafter the evidence in support of said motion was taken, and after reviewing the same the court, at page 234 of its opinion, says:
“The statement in the eighteenth finding, to which the decedent objected, was in the following words: ‘On the 3d of March, 1877, the Secretary of the Navy directed payment of $5,685, in accordance with this adjustment. Murphy was informed of this adjustment,, and of the principles upon ■which it had been made; and thereupon the following voucher was handed to him in duplicate, which he receipted in full, and on which he received the sum of $5,685.’
“We see nothing in the evidence now produced to change the finding found by the court on the evidence then before it. *506 We remain of the opinion that the Secretary authorized the payment only on condition that it should close the controversy, and that the claimant knew this, and with great reluctance and some declarations to outside persons that he would not do so, did accept the payment on those terms.
“Ordered, that the findings of fact which were filed at the last term as the findings in this case remain on file as such findings, filed as of this day, and that the claimant’s petition be dismissed.”
The decedent then appealed to the Supreme Court (104 U. S. E.., 464), and the judgment of this court was affirmed, the court saying:
“We are clearly of the opinion that the acceptance by the claimant, without objection, of the amount allowed by the Secretary of the Navy, in his adjustment of the account presented to him, was equivalent to a final settlement and compromise of all the items of the present claim included in that account. There is nothing in the findings of the court below to warrant a judgment in favor of the claimant upon the only item included in the petition in this case which was not mentioned specifically in the account presented to the Secretary of the Navy and passed on by him in the adjustment he made. ”
Wo have thus given the material and substantial facts and history of the claim in volved in this action f rom itsinception in 1873 until the judgment of this court was affirmed in October, 1881.
Some time prior to February, 1884, the decedent presented his petition to Congress praying for additional compensation for the work done under his contract and for damages by reason of the acts of the defendants in hindering the work, and for the annulment of the contract.
Subsequently Congress passed the private act, approved July 25,1890, referring the claim to this court as hereinbefore stated.
The act grants a rehearing with enlarged jurisdiction and authorizes the court to readjudicate the case “upon the testimony formerly heard in said court and upon such further testimony, including the decedent’s .evidence, as either party may file, pursuant to the rules of the court;” and “in addition to the authority conferred upon it by existing laws, it shall have equitable jurisdiction of all matters presented by the decedent in his new petition,” with authority and direction *507 to speedily render judgment “for such amount as right and justice may demand, without reference to any statute of limitation,” giving to either party the right of appeal to the Supreme Court “upon the entire record considered in the Court of Claims.”
The act clearly clothes the court with equitable powers and enjoins upon üs the exercise thereof in the adjudication of the claim.
The act is in contravention of the well-established rule that it is in the interest of the commonwealth that litigation end. But while this is so, it nevertheless shows the policy and inclination of the Congress to give to the citizen the right to be heard before some competent tribunal in controversies between him and the Government; and it was doubtless because the Congress believed that some injustice had been done the decedent that they heeded his petition for relief and referred his claim to this court for-readjudication.
In his petition in this court under the special act, verified b}' his oath “that he is rightfully and justly entitled to the amount therein claimed from the United States,” after averring the execution of the contract and the various obstacles and difficulties attending the execution of the work by reason of the acts of the defendants, he sets forth in the eighteenth paragraph of his petition an itemized summary of his claim in these words:
“18. That the said items of petitioner’s claim against the defendants for excavation, damages, and losses aggregate the sum of three hundred and thirty-eight thousand eight hundred and forty-one dollars and fifty cents, as follows:

Excavation in original lines.

Original quantity, 95,000 cubic yards.
Not excavated, 20,266 “
Quantity excavated, 74, 734 “ at §1.50. §112,101.00

Extra excavations.

Roadways, 4,830 cubic yards, at §1.50 . 7,245.00
Enlarging pit, 21,369 “ “ 3.00 64,107.00
Timber slide, 2,043 - “ “ 3.00 6,129.00

Excavating caves and slides.

From sides of pit, 15, 000 cubic yards, at §1.50. 22,500. 00
From cofferdam, 1,000 “ at 3.00. 3,000. 00
From end of pit, 4,000 “ at 3.00. 12,000.00

*508
Damages from increased expenses.

Building temporary dam. §350. 00
Rebuilding railway tracks. 300. 00
Extra haul to cofferdam. 350. 00
During ninety days’ idleness. 2,690.50
Dumping into bay 40,432 cubic yards, at 50c. 20,216. 00
Excavating without powder 16,547 cubic yards, at §1.50. 24,820. 00

Losses by annulment of contract.

Profits lost, 20,266 cubic yards, at 50c. 10,133. 00
By foreclosure of mortgages. 31,200 00
By forced sale of plant. 21, 700. 00
Total. 338, 841. 50
The case was first submitted to the court, without argument, on the 22d day of December, 1898.
But as the record in the case was voluminous, containing 972 printed pages, and the amount claimed was large, the case was remanded for oral argument, and after able and elaborate arguments on both sides, in addition to voluminous briefs, the case was last submitted on the 13th day of December, 1899.
Under the special act, the decedent comes into court seeking-equitable relief after his claim has had executive and judicial investigation, and it therefore rests upon him to show, by satisfactory evidence, wherein error was committed to his detriment.
Contrasting the items of his claim as originahy presented to the Navy Department with the claim now presented, it will be observed: That for excavating 15,000 cubic yards of slides at 74 cents per cubic yard, $11,100, he now charges for the same work $1.50 per cubic yard, or $22,500; for extra labor and expense by reason of being prohibited from the use of gunpowder in blasting, $17,848, while his present claim therefor is $24,820; for the difference in the place of dumping earth from the pit, $6,500, while his present claim therefor is $20,216; for extra expense in extending the head of the pit, $1,500, while his present claim is for $64,107; for delays of the Government in excluding tide water and limiting his space for work, $20,000 is apparently omitted in his itemized claim, though embraced in the general averments in paragraphs three and four of his petition.
*509 In addition to tbe foregoing.items be now claims for—
Excavating and removing roadway and caves on slides from the sides of the pit.$7,245.00
Eor timber slides. 6,129.00
Eor building a temporary dam. 350. 00
Eor rebuilding railway tracks.J l..1. 300.00
Eor extra haul to cofferdam. 350.00
For expenses during ninety days’ idleness. 2, 690.50
He also includes an item for profits on 20,266 cubic yards of material remaining to be excavated when his contract was annulled, for which he claims 50. ^ceuts per cubic yard, or $10,133!
To all of which is added $31,200 for loss on account of foreclosure of mortgages, and $21,700 for loss by reason of forced sale of his plant.
The decedent seeks to justify the enlargement of his claim on the ground that by reason of the failure of the defendants to complete the cofferdam so as to keep the tide water out and give him the possession of the entire site of the dock, he had “repudiated the contract” to avoid the forfeiture of $100 per day for every day the work remained incomplete beyond the time stipulated in the contract; and that he had so notified Admiral Rodgers, who requested him to go on with the work and promised that he should have more time and a greater price therefor than that stipulated in the contract. And under that arrangement he claims $1.50 per cubic yard for some of the excavation and $3 per cubic yard for other and more difficulty work, including the excavation of 15,320 cubic yards with picks after May 15, 1874, when he was forbidden the use of gunpowder in blasting.
The evidence shows clearly that the defendants did not complete the cofferdam so as to keep the water out of the pit, thereby narrowing the space within- which the decedent had to work and making it more expensive to him; and the evidence, consisting of the depositions of the decedent and his attorney, Mr. Foote, and one Copehart, neither of whom appears to have testified in the original action, tends to show that Admiral Rodgers did promise him that if he would go ahead with the work he should be properly compensated therefor; but there was no such contention before the Navy Depart *510 ment nor in tbe original action in this court; nor was there any sucb averment in the original petition, and as matters were then fresh in the mind of the decedent, we are not satisfied from the evidence now offerd that any such promise was made even if he were entitled to .predicate a right of action thereon.
The statement of this case would seem to dispel any right to equitable relief, and yet the evidence which we have examined and analyzed tends to support the decedent’s theory of inadequate compensation for the work he actually did. But the evidence, coupled with the apparent probabilities of the case, do not by anjr means satisfy us that the decedent suffered any loss or damage by the action of the defendants or their officers otherwise than as was claimed by him- at the time he presented his claim to the Secretary of the Navy.
If the decedent had been permitted to complete his contract by excavating and removing the remaining 20,266 cubic yards of material at the price agreed upon in the contract, he would have been entitled to $14,996.84 therefor.
Construing the act of our jurisdiction as opening up the whole case and conferring “equitable jurisdiction” upon the court, to “render judgment for such amount as right and justice may demand,” we understand that Congress intended by the language used to confer upon the court broader powers than existed when the case was before us under the general jurisdiction of the court.
The act in effect eliminates from our consideration those rigid rules of law which were applicable to the case when it was originally before us, and enjoins upon us the modification of such rules by the application of equitable principles.
The evidence before us establishes with reasonable certainty that the claim presented to the Navy Department was referred by the Secretary thereof to,Yon Schmidt, a consulting engineer, and then to Admiral Rodgers, the commandant of the navy-yard, for examination without the decedent’s knowledge or consent; and while the circumstances under which the payment of $7,024 was made on the item of the claim for 15,000 cubic yards of slides excavated is not shown, it does appear from the evidence that at the time of the payment of the sum of $5,685 so recommended by Admiral Rodgers on the items *511 of tbe claim hereinbefore stated, the same was received by the decedent and receipted for by him in full under protest, and with the understanding that he wordd not thereby be deprived of his right to prosecute the claim before Congress or the courts for additional compensation growing out of the acts of the defendants. Therefore, we will' proceed to consider the items of the- claim as originally presented to the Navy Department.
The principles upon which the Secretary of the Navy authorized Admiral Rodgers to examine and determine what amount, if anything, should be allowed the decedent in addition to the allowance theretofore made, may be summarized as follows:
(1) If by the terms, or fair implication; of the contract, or if omitted therefrom by the circumstances of the case, the Government was to exclude the tide water from the site of the dock, that was a condition precedent, and the time within which the work was to be completed would not begin to run until such condition was fulfilled; and that any loss resulting therefrom to the decedent should be equitably adjusted.
(2) That if the use of gunpowder was an ordinary, cheap, and convenient mode of making excavations, and was used on • ordinary occasions therefor, and its use was not restricted by the contract in terms, or by implication, then the decedent should not be dteprived of its use without proper allowance for the increased cost occasioned thereby.
(3) That although the contract required the decedent to deposit the excavated materials at such place within the navy-yard as might be designated by the engineer in charge,' still such provision was subject to a reasonable construction, and that the decedent should not be required to deposit such materials at an inconvenient place over or through intervening obstructions, such as water and mud flats.
The principles thus announced as the basis for the settlement of the three classes of claims appear to be equitable, even in the light of the act of our equitable jurisdiction; so the only question for us to determine in respect thereto is,' Were the allowances reasonable under the circumstances?
The item of the claim for the delaj^s of the Government in excluding tide water, and to which the first of the principles *512 announced applies, does not appear in that shape in the present claim, though doubtless the several items of the claim for extra excavation and for excavating- caves and slides, and for some of the items for damages are based thereon. For the delay aforesaid the original claim, both in the Navy Department and in this court, was for $20,000, upon which the decedent was allowed by the Navy Department $2,000. The evidence before us shows that the decedent suffered greater loss by reason of the failure of the defendants to keep the site of the dock drained than was paid him. and considering all the evidence and the allowances herein made on other items resulting therefrom we think $1,500 additional would be equitable thereon.
For the item of $17,848 for extra labor and expense by reason of being forbidden the use of gunpowder the decedent was allowed nothing by the Navy Department. That item in the present suit is for $24,820. After he he was forbidden the use of gunpowder, on May 15,1874, he excavated 15,320 cubic yards of materials by means of picks. We think the evidence fairly shows that it was worth 50 cents per cubic yard more to excavate without the aid of gunpowder than it was with it; and at this rate for 15,320 cubic yards the decedent is entitled to recover on the item $7,660.
For the item for the difference in the place of dumping the excavated materials, for which the original claim was for $6,500, and in his present claim for $20,216, he was allowed by the Navy Department, including $500 for injury to his railroad track at the place of dumping, $3,335.
Prior to the contract the materials which had been excavated by the defendants, not required to fill in the cofferdam, had been deposited on firm ground within a reasonable distance from the place of excavation, and there still remained firm ground on which the decedent could have deposited materials so excavated by him, but he was required to deposit about 34,000 cubic yards of the materials about 1,500 feet from the place of excavation, on and over marsh land and mud fiats, thereby entailing upon him an extra expense above that which it would have cost him to dump said material on firm ground at or in the immediate vicinity of the place were the Government officers had dumped materials prior to the *513 contract. Under the evidence we think an additional allowance of $3,165 as claimed would be equitable under the circumstances, and we accordingly allow that sum.
In addition to the foregoing items there is one for $11,100 for excavating 15,000 cubic yards of slides, now claimed at $22,500, upon which there was allowed for 9,493 cubic yards, at 74 cents, $7,024, leaving on that item $4,076. We think the evidence establishes with reasonable certainty the excavation of a little more than 14,000 cubic yards, but as only 74 cents per cubic yard was asked for it when the claim was filed in the Navy Department, we 'adopt that price and allow $3,500 as the reasonable balance due thereon.
Another item in the original claim was for extra expense in extending the head of the pit, for which $1,500 was claimed, though in his present claim he apparently charges $64,107 for the same work. No allowance was made to the decedent on this item, but the evidence before us shows that he did the work and that it was reasonably worth the sum charged in his original claim, and so the $1,500 will be allowed as equitable.
We have confined the allowances to the items of the claim as originally presented to the Navy Department.
The allowances thus made maybe summarized as follows:
For failure of the Government to keep the site of the dock drained, thereby limiting the space for work. $1,500
For excavating 15,000 cubic yards of slides, at 74 cents per cubic yard, $11,100, less amount heretofore paid, $7,024, leaving $4,076 of which amount we allow. 3,500
For extra labor and expense by being prohibited the use of gunpowder . 7,660
For difference in place of dumping, $6,500, less amount heretofore paid, $3,335, leaving due thereon. 3,165
For extra expense extending head of pit, $1,500. 1,500
Total amount allowed for which judgment will be entered . 17, 325
The allowances made, added to the sum heretofore paid to the decedent, to wit, $59,260, make in all $76,585 for the excavation he did, or about 25 cents per yard more than agreed upon in the contract.
The allowances, under the circumstances of the case, we think meet the requirements of the act of our jurisdiction, which directs us “to render judgment for such amount as *514 right and. justice may demand, without reference to anjr statute of limitation,” and that we have endeavored to do under the “equitable jurisdiction” conferred, and the decedent will therefore be entitled to recover judgment for the sum of $17,325, which is accordingly ordered.