Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff, Pocono Pines Assembly Hotels Company, is a Pennsylvania corporation incorporated, as its name indicates, to acquire, operate, and conduct hotel properties. On March 4, 1931, the following enactment of Congress was approved, viz:
“ The case of the Pocono Pines Assembly Hotels Company against United States of America, Number J-543 be, and hereby is, remanded to the United States Court of Claims with complete authority, the statute of limitations or rule of procedure to the contrary notwithstanding, to hear testimony as to the actual facts involved in the litigation and with instructions to report its finding of facts to Congress at the earliest practicable moment.”
On March 31,1931, this court entered the following order:
“ CONGRESSIONAL BbEERENCE No. A
“ In the above-entitled case the court rendered judgment in favor of plaintiff and against the United States for $227,-239.53. The time for filing a petition for writ of certiorari in the United States Supreme Court having expired, a certified transcript of the judgment was duly transmitted to the Treasury Department and the judgment came before the Seventy-first Congress, 2d session, for appropriation and the Congress in the act approved March 4, 1931, inserted in section 3 thereof the following provision:
“ ‘ The case of the Pocono Pines Assembly Hotels Company against United States of America, Number J-543 be, *450 and hereby is, remanded to the United States Court of Claims with complete authority, the statute of limitations or rule of procedure to the contrary notwithstanding, to hear testimony as to the actual facts involved in the litigation and with instructions to report its finding of facts to Congress at the earliest practicable moment.’
“ Now, therefore, pursuant to the direction of the Congress, it is
“ Ordered that this matter be, and the same hereby is, referred to Commissioner Israel M. Foster with directions that he forthwith hear such testimony as may be offered by either the Pocono Pines Assembly Hotels Company or by the United States of America and make a report of the facts to the court.”
On April 13, 1931, the plaintiff corporation filed its petition in this court, praying a stay of further proceedings in the case and asking for a revocation of the above order of reference. Upon this petition issue was joined and the matter was set down for oral argument on May 11, 1931, the plaintiff corporation being represented by its attorney, the Department of Justice by its representative, and Mr. A. Mitchell Palmer appearing amicus curiae. The plaintiff corporation’s petition now under consideration alleges that Congress in the enactment of the act of March 4, 1931, exceeded its constitutional power. An issue of such vital importance exacts, we think, in the first instance a detailed history of the case of the plaintiff corporation out of which this controversy arises.
The records of the court disclose that on November 28, 1921, the plaintiff corporation first instituted suit under our general jurisdiction, section 145, to recover for the losses involved. (No. H-512.) This petition, so far as material to this discussion, alleged the execution of a written lease by the plaintiff and defendant on April 16, 1921, by the terms of which the defendant acquired, among other properties, the possession and occupancy of a large hotel building, power-house annex, and garage, together with all their contents and equipment, for use by the Federal Board for Vocational Education as a vocational school. The property was located in Monroe County, Pa., and embraced about 300 acres of land and numerous buildings thereon, all de *451 signed for use in connection with the hotel proper, known as Pocono Pines Inn. The Federal board was to be put in possession of the premises on May 1, 1921, and the lease extended to June 30, 1924, with right of the Government to renew the same. Pent was to be paid at the monthly rate of $7,250, i. e., $87,000 per annum, subsequently reduced to $82,000. The lease contained, among others, this important covenant, viz:
“And the said party of the second part further covenants and agrees to quit and deliver up the said premises and property peacefully and quietly to the party of the first part at the expiration of the period' specified in like good order and condition as the same now are, reasonable use and wear thereof and damage by fire or other casualty excepted; and the said party of the second part further covenants and agrees to reimburse the party of the first part for any and all damages that may result to the said property or premises, from vandalism or undue carelessness on the part of any of the trainees or employees of the Federal board.”
The petition alleged that on the date of the expiration of the lease the defendant did surrender and deliver to the plaintiff the demised premises, but that the defendant failed to return the same in the condition they were in when received, the Pocono Pines Inn — the large hotel building— the powerhouse annex, and the garage having been^ destroyed, together with all their contents, to the damage of the plaintiff, including certain installments of rental due and unpaid, in the sum of $431,709.85.
On December 22, 1927, the defendant filed a demurrer to the petition, challenging its legal sufficiency upon the grounds, among others, that no official of the Government possessed authority, to obligate the United States in a lease to respond in damages for the vandalism or carelessness of .trainees or employees occupying governmental leased premises and that a cause of action resting upon the breach of such a covenant was one sounding in tort, over which this court had no jurisdiction, a defense subsequently abandoned by the defendant. Briefs pro and con were filed by the parties, and on January 23, 1928, the case on the pleadings came on for oral argument before the court. On the above *452 date and evidently from the bench the court made the following order:
“ Case argued and submitted on demurrer and it is thereupon ordered: ‘ On consideration whereof the court, desiring to be more fully informed as to the facts in the case, doth overrule said demurrer without prejudice to any legal questions involved.’ ” [Italics ours.]
Whereupon on January 26, 1928, the defendant filed a general traverse to the petition, and the court on March 21, 1928, referred the same to Commissioner Carl K. Rang— since resigned — to take the testimony in the case and make his report to the court. On April 5, 1928, testimony was taken by Commissioner Rang in the city of Philadelphia, the plaintiff at the time being represented by Messrs. Schell and Calkins, and the Government by Dan M. Jackson, special attorney of the Department of Justice, and George H. Holcombe, of the general solicitor’s office of the Veterans’ Bureau. The plaintiff produced and examined, and the Government attorneys cross-examined six witnesses, in addition to the presentation of numerous exhibits covering the written lease, etc., etc. The representatives of the Government did not produce or examine a witness, and the taking of further testimony was adjourned until April 19, 1928. No additional testimony was taken on April 19, 1928. On May 2, 1928, the attorneys for the Government filed a plea in abatement, alleging that the plaintiff had a suit pending» in the United States District Court for the Middle District of Pennsylvania for the same cause of action, and therefore under section 154 of the Judicial Code this petition must be dismissed.
Without detailing the intervening proceedings it is sufficient to say that on June 11, 1928, the plaintiff filed a motion to dismiss its petition without prejudice, which motion the court allowed on June 18, 1928. The plaintiff thereafter dismissed its suit in the United States District Court for the balance of unpaid rental alleged to be due, and on July 9, 1928, filed its petition in case No. J-543, identical in all important respects with plaintiff’s petition in case No. H-512, the parties stipulating that the evidence theretofore taken in that case might be filed and used in case J-543. On *453 August 18, 1928, the Government attorneys joined issue by filing a general traverse to the petition in J-543, and on September 27, 1928, the case was for the second time referred to a commissioner of this court to take the testimony of the j>arties and report the facts to the court. Commissioner John M. Lewis, of this court, proceeded to Philadelphia, and on November 16, 1928, held a hearing in that city, after formal notice to both plaintiff and defendant of his purpose so to do, at which time and place there were present Messrs. Schell and Calkins representing the plaintiff, and Messrs. Jackson and Holcombe representing the Department of Justice and the Veterans’ Bureau. The plaintiff produced and examined, and the representatives of the Government cross-examined, four witnesses and introduced various exhibits. The representatives of the Government produced several witnesses, who were duly sworn by the commissioner, but examined only one — Moses Friedman. The plaintiff’s testimony, i. e., the entire record of the plaintiff, established the allegations of its petition. This fact we deem irrefutable. Moses Friedman, the defendant’s single witness, testified that he was superintendent of the vocational school at Pocono Pines Inn from December, 1921, until “ approximately ” June 20, 1924, and that at the present time he was business manager of a similar school at Perry Point, Maryland. He stated that' he was familiar with all the properties at Pocono Pines Inn, and when asked if the Government failed to and did not surrender and return some of said properties to the plaintiff he responded that it did not, for the reason that during the life of the lease certain properties and their contents were burned. The large hotel building and powerhouse annex were burned, he said, on April 29, 1924, and the garage a month ■or two prior to that date. Whereupon, as the stenographic record of the hearing discloses, the attorneys for the Government did not propound another interrogatory to the witness. On cross-examination the plaintiff’s attorney presented the witness with a letter dated April 17, 1923, for identification. The witness identified the letter, admitted that he wrote it, and that it was addressed and mailed' to Mr. Frederic H. Calkins. The representatives of the Gov *454 ernment having closed their case, the plaintiff in rebuttal called Frederic H. Calkins, and while he was upon the stand offered the above-mentioned letter in evidence; and the representatives of the Government offering no objection to its admission, the same was admitted by the commissioner and made a part of the record. This letter is as follows:
“ We have had a number of small fires in this building and the lodge, which have been due to the throwing of ■lighted cigarette butts or lighted matches out of the windows on the shingle roof of the porch of the inn or of the lodge. Up to this date we have been extremely fortunate in discovering these fires while they were in an incipient stage, and have been able to put them out before they have had an opportunity to spread and do extensive damage.
“ This matter has been called to the attention of the student body, and I am now arranging to post a notice once a month on the bulletin board of this building and the lodge, calling attention to the danger connected with carelessness in this regard. I believe this is done by the men without any malicious intent, and is entirely due to thoughtlessness, but we are using every possible means to bring it to the attention of the student body both verbally and by notice on the bulletin board. However, I believe you wiil agree with me that the shingle roofs on the lodge and inn constitute a very dangerous fire hazard.
“ On Sunday night, April 15th, when there .was a very strong wind, there were two such fires, one at 10.45 p. m. and the other about an hour previous. Fortunately for all concerned they were discovered immediately. If either of these fires at the inn had obtained a half hour’s start I doubt very much whether the building could have been saved. If the inn were destroyed in this way it would be utterly impossible to continue the school, and it would have to be closed down.
“ Under the circumstances I would strongly recommend that steps be taken to replace the wooden shingle roofs with asbestos or metal roofs of some kind.
“ We are doing everything possible to cooperate in keeping down the possibility of such conflagrations, both by notifying the students and by the maintenance of an efficient fire organization, but where there are two hundred men, and these men are changing continuously, the danger from throwing lighted matches or lighted cigarette butts out of the windows can not be entirely eliminated. The matter is of such serious importance as to merit immediate attention.’*
*455 We insert tbe letter at this point fully aware that it is not direct evidence of the origin of the fires which destroyed plaintiff’s buildings on the dates involved in this case, but for what it is worth and especially as bearing upon the statements of facts later made by Moses Friedman in an affidavit for a new trial.
The evidence being closed for both plaintiff and defendant, the case came on for a hearing before the court on October 23, 1929, upon the record of facts and briefs of parties, as well as the commissioner’s report and objections thereto. The plaintiff’s brief and argument were specifically addressed to two primary questions of law and facts, i. e., that under the express terms of the lease the plaintiff established its case when it adduced proof of the failure of the Government to return to it the properties leased — the buildings burned — in same condition, reasonable wear and tear excepted, as when turned over to the Government, and that having proved the fact, as well as the damages suffered by the breach, plaintiff was entitled to a judgment.
The representatives of the Government rested their case exclusively upon two propositions: (1) That the plaintiff had not established its case by proof of the facts established by the record, and (2) that under the law and the covenants of the lease the burden of proof rested upon the plaintiff to prove that the fires which destroyed the buildings were not accidental but caused by the vandalism or carelessness of the Government’s trainees or employees, and that in addition the plaintiff’s measure of damages could not be predicated upon replacement cost. No other contention in behalf of the Government was advanced, briefed, or argued by Government counsel. The Government’s defense was rested absolutely upon this single issue, and we think that the record warrants an inference that so firm and certain were they in their fixed opinions of liability under the lease that even in the face of a direct request from the court for all facts in the case, they deemed their production unessential, or they were unable to ascertain and produce the proof. At any rate, the Government did not adduce the proof despite two opportunities to do so, and when at least one witness *456 who claimed to know all about the facts was on the witness stand as a Government witness and not interrogated with reference thereto.
We do not cite the above in criticism of the Department of Justice. The Government, the same as any suitor in this court, has a right to formulate its defense along the lines it deems legally invulnerable. The Government’s representatives, as we think we have a right to infer, after mature deliberation decided to submit its defense upon this legal hypothesis, and as a result of such decision declined to produce the evidence available for production, or was in the position of being unable to produce satisfactory evidence to sustain its defense upon any other hypothesis.
On February 10, 1930, the court in an opinion made a part hereof by reference awarded the plaintiff a judgment for $227,239.53. The Government’s counsel on March 29, 1930, filed a motion for a new trial under the rules of the court. The rules mentioned provide as follows:
“ 76. A motion founded upon an error of fact must specify with minuteness the fact or facts which are regarded as erroneously found or erroneously omitted to be found by the court, with full references to the evidence which is relied upon to support the motion.
“ 77. A motion founded upon error of law must specify with like minuteness the points upon which the court is supposed to have erred, with references to the authorities relied upon to support the motion.
“ 78. A motion by the plaintiff upon the ground of newly discovered evidence will not be entertained unless it appears therein that the newly discovered evidence came to the knowledge of the plaintiff, his attorney of record or counsel, after the trial and before the motion was made; that it was not for want of due diligence that it did not sooner come to his knowledge; that it is so material that it would probably produce a different judgment if the new trial were granted; and that it is not cumulative.
“ Such motion must be accompanied by the affidavit of the plaintiff or his attorney of record, setting forth—
“ First. The facts in detail which the plaintiff expects to be able to prove, and whether the same are to be proved by witnesses or by documentary evidence.
“ Second. The name, occupation, and residence of each and every witness whom it is proposed to call to prove said facts.
*457 “ Third. That the said facts were unknown to either the plaintiff or his attorney of record, and, if other counsel was, employed at the trial, were unknown to such counsel until after the close of the trial.
“ Fourth. The reasons why the plaintiff, his attorney of record or counsel could not have discovered said evidence before, the trial by due diligence.
“ 79. Motion for a new trial must also be accompanied by the brief of the moving party, a copy of which must be served upon the opposing party, who may file his brief in response thereto. The motion will be considered by the. judges in conference upon such briefs and affidavits, if any, and will there be decided or sent to the law calendar for argument.”
The Government’s motion ignored the requirements of the rules; but aside from this fact the court was convinced that the alleged newly discovered evidence produced would not change the opinion of the court. The alleged newly discovered testimony was directed toward statements of facts which asserted defective electric wiring in the building, nonaccess of the trainees to the garage, and an absence of sufficient water pressure to quench the fires. Manifestly nothing was asserted as to the origin or cause of the fires which destroyed the buildings and no statement made as' to defective wiring on the porch where the fire involved, as well as three previous ones, had originated, and therefore the court overruled the motion on April 21, 1930.
On July 21, 1930, almost three years after this suit had been instituted, the representatives of the Government filed a second motion for a new trial, this motion, as well as the right to file the same, being predicated upon section 175 of the Judicial Code, which reads as follows:
“ Seo. 175. The Court of Claims, at any time while any claim is pending before it, or on appeal from it, or within two years next after the final disposition of such claim, may, on motion, on behalf of the United States, grant a new trial and stay the payment of any judgment therein, upon such evidence, cumulative or otherwise, as shall satisfy the court that any fraud, wrong, or injustice in the premises has been done to the United States; but until an order is made staying the payment of a judgment the same shall be payable and paid as now provided by law.”
*458 This motion, like the motion for a new trial, is in most all respects similar thereto. Substantially the same facts are brought to the attention of the court, substantiated in this instance by the attested affidavits of Moses Friedman and John P. Chamberlain. Defendant’s counsel confess their misapprehension of the law and concede that the evidence sought to be introduced was available and might have by the exercise of due diligence been discovered and presented at the time of the original trial. It was not denied, of course, that Friedman was a witness of the defendant and testified before Commissioner Lewis on November 16, 1928. Section 175 of the Judicial Code is 'obviously what the Supreme Court in the Ayres case, 9 Wall. 608, decided in 1869 to be “ new and anomalous.” It was originally enacted as section 2 of the act of June 25, 1868, “An act to provide for appeals from the Court of Claims, and for other purposes.” (15 Stat. 75.) Contemporaneous with the passage of the act of June 25,1868, this court was engaged in the trial and decision of a vast number of abandoned or captured property and war claims under jurisdictional acts of Congress seeking to reimburse loyal claimants who had lost property of this character during the Civil War. These claims, numerically great, involving vast sums of money were susceptible of prosecution in a way that placed the Government at a great disadvantage in defending them. Evidence of the disloyalty of claimants and seizure of cotton by the Federal forces was not always easily procurable, despite diligence to acquire it; the possibility of fraud, wrong, and injustice was acutely present at the time, and, doubtless to protect the Government and mitigate the hardships of procuring proof at this particular time, this section of the act of June 25, 1868, was enacted. We say this because the debates in Congress seem to warrant it, Congress being particularly solicitous, as the various sections of the act of 1868 clearly disclose, in providing for a defense of claims by the Attorney General and an appeal from this court to the Supreme Court on behalf of the United States, irrespective of the- amount involved. Section 2, as quoted above, was subsequently carried into the Judicial Code as section 175 thereof. This court has had *459 comparatively frequent occasions to construe section 175 of the code. In the early case of Child v. United States, 6 C. Cls. 44, decided in December, 1870, the court, commenting upon the meaning of the word “ injustice ” used in the act, said (p. 52):
“ We do not, therefore, see in this section any authority— much less requirement — to award a new trial to the defendants on the ground of injustice, because at the trial their counsel held back evidence which was equally within their knowledge and their power to produce.”
Again it was said (p. 50) :
“ In other words, the defendants’ counsel find that at the trial they made a mistake as to the law, and they ask a new trial that they may rectify that mistake.”
The court denied the motion upon the above as well as the substantial ground that the proffered evidence would not in any event change the result. The court held that the act did extend the time for filing a second motion for a new trial and permitted the consideration of cumulative evidence by the court in ascertaining whether the proffered testimony was sufficient to satisfy the court that the motion was meritorious.
In the case of Silvey v. United States, 7 C. Cls. 305, the precise issue involved in the Child case (supra) was again before the court. The decision of the Child case was sustained by a bare majority of the court. Chief Justice Drake and Judge Loring delivered dissenting opinions. The Chief Justice at length explained his ruling in the Child case and concluded that the scope and intent of the act of June 25, 1868, had the effect of eliminating, in its mandatory provisions, laches or lack of diligence upon the part of the defendant in procuring the evidence relied upon in the second motion. The Chief Justice did, however, subscribe to the rule that the evidence relied upon by the defendant must not have been before the court at the time of the trial, and was not known to the officer representing the Government in the case. The cases cited were abandoned or captured property ones involving proof of the capture or seizure of cotton during the war, its sale by the Union forces, and de *460 posit of the proceeds of sale in the Treasury. In each case testimony had been adduced by the plaintiff establishing precedent facts essential to recovery, and subsequently* after judgment, the defendants discovered documentary and other evidence alleged to be conclusively effective in proving that the plaintiff’s evidence was untrue. The challenge was in its essence to the veracity of the record, an allegation of a fact, which if known, and which in the confused state of affairs was difficult to ascertain, would have forestalled recovery. In Henry v. United States, IS C. Cls. 162, the opinion of the court in the Child ease was reversed, Chief Justice Drake delivering the opinion of the court, and in the case of Ford v. United States, 18 C. Cls. 62, the dissenting opinion of Chief Justice Drake was declared to be the rule of the court with reference to motions for a new trial under the act. Therefore, it may be said that the court committed itself to a construction of the act that' its provisions were mandatory when the evidence offered was suffi- - cient to reasonably satisfy the court that fraud, wrong, or injustice had been done the defendant; that cumulative evidence was to be considered, and neither laches nor want of — " diligence upon the part of the officers of the Government in charge of the case; was a sufficient reason for denying the relief. When the defendant’s statement of the new evidence made out a prima faeie case this was held sufficient . to allow the motion, the court adhering to the rule that the evidence must not have been before the court at the time and must not have been known to the Government’s counsel in the case. In the case of Gorham v. United States, 29 C. Cls. 97; 165 U. S. 816, the personnel of the court having changed, the opinion of the court in the Ford ease {supra), was overruled and the court returned to its original convictions in the Child and Silvey eases {supra). The court said in the Gorham ease (p. 106) :
“ Therefore a new trial founded on newly discovered evidence should not be allowed where the evidence might have been known to the former law officers charged with the defense of the action. (Silvey’s ease, 7 C. Cls., R. 305.)
“ Cases may undoubtedly arise where the mistake, error, or negligence of an officer charged with the defense of the *461 Government is so serious or so palpable that it would be a wrong and injustice to allow a judgment to stand. The employment of agents by ordinary principals is voluntary, and the principal has a direct personal interest in the agency, which should render him vigilant to watch the vigilance of his representative. This is true also of corporations, for the directors are stockholders, and every stockholder has a direct personal interest in what the agent of the corporation does. The Government, on the contrary, is a personality, which can act only by agents, and there is no person who has a direct personal interest in the result of a suit which can induce him to watch the vigilance and fidelity of the law officers who defend it. But it is at the same time manifest that, where a case has been carefully prepared by a law officer of the Government and elaborately argued and carefully considered, the judgment which results should not be lightly set aside, and only where the fraud, wrong, or injustice complained of is established beyond reasonable doubt.”
We think, without reviewing the decided cases in this court, which would prolong this discussion to tedious length,, that they will disclose that this court has uniformly given to this extraordinary privilege extended to the United States in the procurement of new trials under Sec. 175 a construction in harmony with its apparent purpose and intent. Eliminating adherence to technicalities. and viewing the facts and circumstances of each case as presented, the court has never hesitated to allow a motion when the facts disclosed that a legal injustice had been done the Government. We have not as a rule allowed-a motion when it was evident that resort thereto was simply to enable the defendant’s counsel to procure a new trial upon precisely the same testimony relied upon in a similar motion, under the rules, which had been overruled, unless it appeared from the face of the second motion that impelling reasons of legal justice exacted its allowance. We have not construed the word “ injustice ” in the act to mean a carefully prepared and considered judgment against the United States which the law officers of the Government regarded as unsound in law and which could be corrected by resort to the granted right of appeal to the Supreme Court. i We have consistently adhered to the universal rule of courts, that judgments rendered are not *462 to be set aside upon motions for new trial except for convincing reasons disclosing a positive denial to one or tide other parties of legal rights and privileges. No case, we think}can be cited where this court has ignored the benefiqial provision of section 175 of the Judicial Code in so far as the Government is concerned, but on the contrary have allowed' or disallowed the motion as the record in the case demon-, strated either the presence or absence of legal injustice in view of and in keeping with established precedents. McKay case, 30 C. Cls. 1; Monroe case, 37 C. Cls. 79; Goodrich case, 48 C. Cls. 61; Purcell Envelope case, 48 C. Cls. 66; Axman case, 48 C. Cls. 376; Bush, Receiver, v. United States, 55 C. Cls. 485; Volk case, 56 C. Cls. 395.
The status of the case on the date of the filing of defendant’s motion for a new trial was as follows: The first petition had been filed over two and one-half years previous to that date. Two hearings had taken place for the production of testimony, at both of which the defendant’s counsel had been present and cross-examined plaintiff’s witnesses, one hearing over two years before and the last over a year and a half before. The defendant’s counsel had produced several but examined only one witness, the same witness whose affidavit was attached to the motion for a new trial under section 175, although the court had by special order sought the facts. The case had been briefed, argued, and submitted by the defendant’s counsel upon the theory that the Government had not and did not intend to call a single witness to refute the plaintiff’s contention; and that the plaintiff had failed to establish its case, had not proved a breach of the lease, and ..the burden of proof rested upon it to prove the same. No mention is made in the Government’s motion of available testimony or lack of it, a distinct admission that the Government submitted the case under the firm conviction that no legal obligation, in view of the record, imposed upon it the necessity of doing more than was done. In other words, the record warranted the inference that the Government had either made no effort to prove the facts now alleged as available, or, making such an effort, discovered its inability to sustain a defense from *463 the standpoint of fact, until after a decision of this court. Aside from all this, however, the court did consider the alleged newly discovered evidence — facts known and in existence, with available witnesses to testify thereto, from the date of the fires — set forth in the affidavits and exhibits attached, and concluded that, granting' the witnesses would testify as alleged, the evidence did not make out even a prima fade case for the defendant, much less remove a reasonable doubt, and hence would not change the opinion of the court. Our view was then and is now that the defendant’s testimony disclosed no more than that the witnesses — disregarding their obvious inferences and arguments which manifested deep interest and concern as well as a desire to escape responsibility for what happened — did not know the origin or cause of the fires and could not testify thereto. So believing, the motion was overruled. Our determination in this respect is final under the law; no appeal may be predicated thereon. Young v. United States, 95 U. S. 641.
The Government, however, possessed the right under section 3 of the act of February 13, 1925 (43 Stat. 939), to petition the Supreme Court for a writ of certiorari to review our decision, and section 8 (a) of the act allowed ninety days in which to do so. The Government did not file a petition for a review, and hence the judgment of this court became final at the expiration of the ninety-day period.
On January 5, 1931, the Secretary of the Treasury transmitted, among others, the foregoing judgment to the Director of the Bureau of the Budget for submission to Congress for payment. On January 7, 1931, the Director of the Bureau submitted the list of judgments to the President, with the following memorandum:
“ Since the foregoing are obligations of the Government lawfully imposed, and which (subject to the reserved right of appeal) must be paid, an appropriation for the purpose is necessary at this time.”
The President immediately transmitted the list of judgments, including this one, to the President of the Senate, stating his concurrence with the conclusions and observa *464 tions of the Director of the Bureau of the Budget. Thereafter the Senate Committee on Appropriations was informed that the judgment in the case was secured without the interests of the Government being fully protected, and the chairman of the committee then stated that the matter should be referred to the Comptroller General to investigate and report. The Comptroller General supplied a written report and also appeared in person before the'committee, at the committee’s request. This case had been before the comptroller in 1927 on the question as to whether the United States was liable for the losses claimed under the terms of the lease, due to the destruction of the buildings by fire, and the Comptroller General denied the plaintiff’s claim upon a question of law, without testimony, i. e., decided that under the terms of the lease the United States was not liable for the same. We quote the decision in full:
WashingtoN, D. C., September 30,1987.
Pocono Pines Assembly Hotels Co., 986 Stephen Girard Building, Philadelphia, Pa.
Your claim (s) for $431,709.85 covering damages or loss alleged to have been suffered on account of the use and occupancy of certain premises at Pocono Pines, Pennsylvania, by the Veterans’ Bureau under lease dated April 6, 1921, has (have) been examined and disallowed, per the above certificate number, for the following reasons:
The various items of claim fall under one or the other of the following classes: (1) Value of property (buildings, furniture, equipment, etc.) , destroyed by fire during the life of the lease; (2) depreciation of the remaining property due to the loss by fire described in (1); and (3) value of property alleged to have been unaccounted for by the Government at the termination of the lease.
(1) By the terms of the lease (paragraph nine) the Government was exempted from liability for loss by fire, but the Government was liable for any damage caused by “ vandalism or undue carelessness on the part of any of the trainees or employees of the Federal board.” The fires which occurred were not caused in any way by trainees or Government employees.
(2) Since the Government .was not responsible for the direct loss caused by fire, it can not be held for the more remote, indirect loss by fire, namely, the alleged depreciation in the value of the undestroyed property.
*465 (3) The lease (ninth paragraph) obligated the Government to deliver up to the lessor at the termination of the lease the property covered by the agreement in as good condition as when received, reasonable wear and tear and damage by -fire excepted. This provision of the lease the Government performed in full. The allegation that the Government failed to turn over property as it was bound to do is not supported by the facts.
J. R. McCaRl,

Comptroller General.

NYM By (Signed) Oslando P. Sykes.
In this connection it is proper to observe that the Government has not contended that the lease excepted “ damage by fire.” The lease does not so provide; it reads “ damage by fire or other casualty excepted,” and the Government has not challenged the correctness of the court’s opinion as to the meaning of this covenant in the lease. What was said and done by the committee is a public record and we need not revert thereto. It is sufficient to observe that when the report reached the Senate the legislation quoted in the beginning of this opinion was inserted and passed by the Senate and subsequently by the House, being approved on the date heretofore cited. Thereafter the proceedings in this court occurred as set forth herein.
We have gone into this lengthy detail of the history of this case in order to disclose that the subject-matter of the case was one which came within the general jurisdiction of this court, that the case was adjudicated thereunder in accord with settled legal procedure, and judgment awarded after both of the parties had had their day in court and resorted to all prescribed legal procedure to obtain and protect their rights under the law. The plaintiff has not been charged with fraud, wrong, or, by any act of it, perpetrating an injustice upon the United States. The gravamen of the charge of injustice can manifestly extend to no other limit than the fact that the court was convinced that the contention of the plaintiff upon the record must be sustained, and the Government’s representatives acquiesced therein, did not seek a review, and thereby accepted the judgment of the court as final. If the defendant believed the court was wrong, the *466 way was expressly pointed out to correct the error by a review of its judgment by the Supreme Court of the United States.
Before discussing the jurisdiction and powers of the Court of Claims it should be stated at the outset that the court has jurisdiction of two distinct classes of cases: First, those arising under sections 145 and_180 of the Judicial Code and special jurisdictional acts, wherein the plaintiff sues in his own behalf as a matter of right and in which the court awards final judgments, with the right of either party to apply to the Supreme Court for a writ of certiorari for a review; second, jurisdiction under sections 148_ and 151 of the code where a case may be referred which may involve the finding of facts and report to Congress without the right of appeal, a subject matter discussed in detail hereafter.
On February 24, 1855 (10 Stat. 612), Congress passed an act entitled “An act to establish a court for the investigation of claims against the United States,” as will be hereinafter shown by reference to subsequent acts of Congress and the decision of the Supreme Court in the case of United States v. Jones, 119 U. S. 477. This act is simply of historical importance and now of no effect. The act, embracing eleven' sections, erected a tribunal to be composed of three judges and conferred upon it a limited jurisdiction to investigate claims against the United States “ founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States.” The conclusions of the court expressed in opinions were to be reported to Congress at the commencement of each session and each month thereafter during the session, the court being expressly commanded to prepare a bill or bills, in cases receiving a favorable consideration, for congressional action to carry its conclusions into effect.
The foregoing act clearly manifests a congressional intent to accomplish no more than the creation of a tribunal, designated a court, it is true, but in fact no more than a commission exercising powers of investigation with the single *467 right of stating its conclusions to Congress in the form of written opinions and especially prepared bills for legislative action. Whatever of judicial power resided in the court was so circumscribed as to render its conclusions and opinions no more than recommendations to Congress. The term “ judgment ” is not used in the act, and obviously it was carefully prepared with a view of the nonsurrender by Congress of its legislative power over claims of this character against the Government. Klein case, 13 Wall. 128, 144. Considered in the light of the time of the enactment of the statute, it was seemingly an experiment designed to relieve Congress, to the extent provided, of the investigation of private claims accumulating to a vast extent and working hardship upon citizens and the committees of Congress as well.
President Lincoln in his message to Congress December 3,1861, recommended, with reference to the Court of Claims, as follows:
“ It is important that some more convenient means should be provided, if possible, for the adjustment of claims against the Government, especially in view of their increased number by reason of the war. It is as much the duty of Government to render prompt justice against itself in favor of its citizens as it is to administer the same between private individuals. The investigation and adjudication of claims in their nature belong to the judicial department. Besides, it is apparent that the attention of Congress will be more than usually engaged for some time to come with great national questions. It was intended by the organization of the Court of Claims mainly to remove this branch of business from the halls of Congress; but while the court has proved to be an effective and valuable means of investigation, it in great degree fails to effect the object of its creation for want of power to make its judgments final.”
Thereafter the amendatory act of March 3, 1863 (12 Stat. 765), sometimes referred to as the reorganization act, was enacted and conferred judicial power upon the Court of Claims. This statute, containing fourteen sections, enlarged the personnel of the court from three to four associate judges and a chief justice. It provided that all petitions or bills praying for the satisfaction of private claims pend *468 ing in Congress, founded upon any law of Congress or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States unless otherwise ordered by resolution of the House in which the same is pending, should be transmitted by the proper officials to the court, and conferred jurisdiction upon the court to consider and adjudicate all counterclaims or set-offs which might be interposed by the Government, expressly granting to the court authority to render judgment as the rights of the parties might appear, such judgment to be final, with the right of appeal to the Supreme Court granted to either party where the amount involved exceeded three thousand dollars. The Government was to be represented in all cases by a solicitor appointed by the President. A six-year statute of limitation was provided. The appointment of clerks and a bailiff was authorized. Rules of practice were to be formulated by the court. Its judgments when paid were conclusive of litigated rights and barred any future claim of like character upon the plaintiff’s part. The act required the certification of judgments to the Secretary of the Treasury, and the fourteenth section thereof provided “ That no money shall be paid out of the Treasury for any claim passed upon by the Court of Claims till after an appropriation therefor shall be estimated. for by the Secretary of the Treasury.”
At the October term, 1863, of the Court of Claims the court decided the case of Gordon, Administrator of Fisher, deceased,. 1 C. Cls. 1, adversely to the plaintiff’s contention, sustained a demurrer to the petition, and dismissed the same. Gordon appealed to the Supreme Court under the provisions of the act of March 3, 1863 (supra). The Supreme Court refused to entertain the appeal, holding that the fourteenth section of the act of March 3, 1863, quoted above, by implication at least, gave to an executive officer supervisory power over the court’s judgments, thereby denying their finality and to that extent denying to the Court of Claims the exercise of judicial power essential to be authorized in order for the Supreme Court to take appellate jurisdiction. There was no opinion delivered by the Supreme Court *469 in the report of the Gordon case in 2 Wall. 561. One was, however, sent down with the mandate of the Supreme Court to the Court of Claims and published by the court in 7 C. Cls. 1. The opinion is brief and is as follows:
“ The court has fully considered the able and instructive arguments of counsel upon the question of jurisdiction, which presents itself at the threshold of this cause, and has found itself constrained to the conclusion that under the Constitution it can exercise no appellate jurisdiction over the decisions of the Court of Claims.
“We think that the authority given to the head of an executive department, by necessary implication, in the fourteenth section of the amended Court of Claims act, to revise all the decisions of this court requiring payment of money, denies to it the judicial power from the exercise of which appeals can be taken to this court.
“ The reasons which necessitate this conclusion may be more fully announced hereafter. At present we restrict ourselves to this general statement, and to the direction that the case be dismissed for want of jurisdiction.”
We think that in connection with the citation of the case of Gordon v. United States, 117 U. S. 697, a case frequently cited, that the case of United States v. Jones, 119 U. S. 477, supra, should also be cited. In the Jones case on appeal from the Court of Claims, Mr. Chief Justice Waite, delivering the opinion of the court with respect to the jurisdictional issue involved in the Gordon case, said (pp. 477, 478) :
“ The case of Gordon v. United States, 2 Wall. 561, holding that no appeal would lie from a judgment of the Court of Claims to this court, was announced March 10, 1865. The cause was originally submitted on the 18th of December, 1863, and on the 10th of April, 1864, it was ordered for argument on the second day of the next term. Chief Justice Taney died October 12, 1864, and the case was not reargued under the special order of the previous term until January 3, 1865. Consequently, the opinion published as an appendix to 117 U. S. 697 must have been prepared by him before the decision was actually made. The records of the court show that in announcing the judgment Chief Justice Chase said: ‘ We think that the authority given to the head of an executive department by necessary implication in the 14th seotipn of the amended Court of Claims act, to revise all the decisions of that court requiring payment of money, denies to it *470 the judicial power, from the exercise of which alone appeals can be taken to this court. The reasons which necessitate this conclusion may be more fully announced hereafter. At present, we restrict ourselves to this general statement, and to the direction that the cause be dismissed for want of jurisdiction.’ This differs somewhat from the case as reported by Mr. Wallace and shows precisely the ground of the opinion, to wit, the special provisions of § 14. * * *
“At the next session of Congress after this decision the objectionable section was repealed by the act of March 17, 1866, C. T9, 14 Stat. 9 * * *. From that time until the presentation of this motion it has never been doubted that. appeals would lie.”
This decision renders the Gordon case of no value as a precedent so far as the jurisdiction of this court is concerned.
And it is important tó note that even the Gordon case was appealed to the Supreme Court under the enabling clause of the act of March 17, 1866, 14 Stat. 9, and was heard and decided by the Supreme Court, 7 Wall. 188, and the judgment of this court was affirmed. The cited cases and what was said therein clearly warrant the assertion that the Supreme Court originally declined appellate jurisdiction under the act of March 3, 1863, upon the grounds of the objectionable provisions of section 14 thereof. A consideration of the provisions of the act of March 3,1863, brings the conclusion that Congress intended the creation of a judicial tribunal for the adjudication and determination of such claims as under the act were to come before it. Congress was affording to the citizen a forum where legitimate claims against the Government of the character enumerated were to receive judicial and not legislative determination, and in so doing not only divested such claims of their legislative character but submitted them in the final analysis to the highest judicial tribunal of the Government. This statement is confirmed by the act of March 12, 1863 (12 Stat. 820), known as the abandoned or captured property act, granting this court jurisdiction to render final judgment in a very important class of cases, and if not so, is, we think, made evident by the passage of the act of March 17, 1866, *471 14 Stat. 9, which expressly repealed section 14 of the act of March 3, 1863, and provided “ an appeal shall be allowed to the Supreme Court of the United States, at any time within ninety days after the passage of this act, except "in such cases where/the amounts found due by said court have been paid at the Treasury.” It is probable and far from unlikely that the pendency in Congress of the abandoned or captured property act prompted in part the passage of the repealing act of March 17, 1866. Legislation of the character of the abandoned or captured property act was exceptional and unusual. It involved a multitude of legal questions as well as vast amounts of money. Issues of title to property taken during the war, questions of loyalty or disloyalty of a claimant, the effect of pardon, amnesty, and others were sure to and did arise. Within the five-year limitation of the act 1,500 cases were disposed of, resulting in judgments aggregating approximately ten millions of dollars, paid by the Government in accord with judgments of this and the Supreme Court, to which many cases went on appeal, a situation similar to that following the recent, war.
An important decision as to the jurisdiction of this court and the extent of its exercise of judicial power under the existing statutes with respect to the same is the case of Klein v. United States (supra). This decision is not only important as affecting the status of the Court of Claims under the reorganization acts of 1863 and 1866, but also as affecting the right of Congress to lay down a rule of decision for the court. The Klein case arose under the abandoned or captured property act. The Court of Claims on the 26th of May, 1869, awarded to Klein a judgment under the act. On June 3, 1869, the United States appealed the case to the Supreme Court, the same being filed in the Supreme Court on December 11, 1869. The above dates are significant, for on July 12, 1870,16 Stat. 230, 235, Congress enacted legisla-' tion declaring in effect and by express words that no pardon,, acceptance, oath, or other act performed in pursuance, or as-a condition of pardon, shall be admissible in evidence in support of any claim against the United States in the Court. *472 of Claims, or to establish the right of any claimant to bring suit in that court. The act also provided that the fact of the acceptance of a pardon or the taking of the oath as a condition to its allowance by the President was to be taken as conclusive evidence by the Court of Claims and the Supreme Court of the claimants’ disloyalty and upon proof summarily made or upon motion the “jurisdiction of the Court of Claims, and the Supreme Court if the case had been appealed, should cease and the suit be forthwith dismissed. Proof of loyalty of the plaintiff was an absolute precedent condition to the right of recovery, made so by the jurisdictional act. Chief Justice Chase, in an opinion affirming the judgment of the Court of Claims, said (13 Wall. 128, 144-146):
“ It was urged in argument that the right to sue the Government in the Court of Claims is a matter of favor; but this seems not entirely accurate. It is as much the duty of the Government as of individuals to fulfill its obligations. Before the establishment of the Court of Claims claimants could only be heard by Congress. That court was established in 1855 [1] for the triple purpose of relieving Congress, and of protecting the Government by regular investigation, and of benefiting the claimants ’by affording them a certain mode of examining and adjudicating upon their claims. It was required to hear and determine upon claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or im-~ plied, with the Government of the United States.[2] Originally it was a court merely in name, for its power extended only to the preparation of bills to be submitted to Congress.
“ In 1863 the number of judges was increased from three to five, its jurisdiction was enlarged, and, instead of being required to prepare bills for Congress, it was authorized to render final judgment, subject to appeal to this court and to an estimate by the Secretary of the Treasury of the amount required to pay each claimant.[3] This court being of opinion [4] that the provision for an estimate was inconsistent with the finality essential to judicial decisions, Congress repealed that provision.[5] Since then the Court of Claims has exercised all the functions of a court, and this court has taken full jurisdiction on appeal.[6]
*473 “ The Court of Claims is thus constituted one of those inferior courts which Congress authorizes, and has jurisdiction of contracts between the government and the citizen, from which appeal regularly lies to this court.
“Undoubtedly the legislature has complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decisions. _ And if this act did nothing more, it would be our duty to give it effect. If it simply denied the right of appeal in a particular class of cases, there could be no doubt that it must be regarded as an exercise bf the power of Congress to make ‘ such exceptions from the appellate jurisdiction ’ as should seem to it expedient.
“ * * * The proviso further declares that every pardon granted to any suitor in the Court of Claims and reciting that the person pardoned has been guilty of any act of rebellion or disloyalty, shall, if accepted in writing without disclaimer of the fact recited, be taken as conclusive evidence in that court and on appeal, of the act recited; and on proof of pardon or acceptance, summarily made on motion or otherwise, the jurisdiction of the court shall cease and the suit shall be forthwith dismissed.
“ It is evident from this statement that the denial of jurisdiction to this court, as well as to the Court of Claims, is founded solely on the application of a rule of decision, in causes pending, prescribed by Congress. The court has jurisdiction of the cause to a given point; but when it ascertains that a certain state of things exists, its jurisdiction is to cease and it is required to dismiss the cause for want of jurisdiction.
“ It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power.
“ The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is thisjout to prescribe a rule for the decision of a cause in Nparficmaf wayT In* the' case Tefofe' W~thmCbuft'*7T~CIaims 'Nas”fen-dered judgment for the claimant and an appeal has been taken to this court. We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted to the intestate of the claimants. Can we do so without allowing one party to the controversy to decide it in its own favor ? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial»/ Department of the Government in cases pending before it? ”
*474 In so far as the quoted holding of the court is concerned, the opinion of the Supreme Court was unanimous; two justices dissented upon other principles of law involved in the case. Congress, the Supreme Court said, attempted to declare the effect as evidence of a pardon, notwithstanding the established rule that a pardon is such “ that in the eye of the law the offender is as innocent as if he had never committed the offence.” Padelford case, 9 Wall. 531, 542; Ex parte Garland, 4 Wall. 380. In carefully chosen words the question is exhaustively discussed by the court and a conclusion reached. “We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power.” Klein case, supra, p. 147. Later the precise issue was again mooted in the Court of Claims by the Government, and the court held that the Amnesty Proclamation of the President of December 25, 1868, 15 Stat. 711, “ relieves a citizen coming within its terms from making proof of loyalty.” Witkowski case, 7 C. Cls. 393. In that case the court in deciding the issue said:
“It is, however, said that the case before the Supreme Court only involved the question of the jurisdiction of that court, and only affects cases on appeal depending there; that the decision can not be extended beyond the facts on which it rests, and does not control or apply to cases depending here.
V $ »!• í¡¡ í¡í í¡; í¡{
“ If any doubt remained as to the meaning of the extent of the Supreme Court’s decision, it would be dissipated by the fact that ‘ it was urged in argument ’ in the court above, ‘ that the right to sue the Government in the Gourt of Claims is a matter of favorf and, hence, that Congress can prescribe the rule of decision in every case. To which the opinion of the Supreme Court replies that £ this seems not entirely accurate/’ ‘ that it is as much the duty of the Gov'-ernment as of individuals to fulfill its engagements,’ and that the Court of Claims is one of ‘ those inferior courts which Congress authorizes,’ but which exercises ‘ all the functions of a court? It is the unquestionable intent of the decision that the statute is unconstitutional because it interferes with the proper administration of justice in the judicial department of the Government, of which the Court of Claims is an element; and that while Congress may withdraw cases from its jurisdiction, or prescribe the terms and *475 conditions npon which actions may be brought, yet- Congress can not prescribe to it a rule of decision, nor interfere with the proper exercise of its judicial functions.” '(Pp. 394, 395, 397.) See also Backer's case, 7 C. Cls. 551.
Thereafter, without challenge, this court, in accord with the opinion of the Supreme Court in the Klein case {supra), awarded judgment to claimants under the jurisdictional act amounting to vast sums of money, and the judgments were paid. In United States v. O'Grady, 22 Wall. 641, the Supreme Court in adjudicating an appeal from a judgment in favor of the plaintiff was confronted with the issue as to the right of the Govermnent to deduct an internal-revenue tax from the judgment awarded the plaintiff, the right being claimed as lawful and its exercise warranted by the Secretary of the Treasury. The case was one under the abandoned or captured property act. The record in the case established the fact that in the proceedings before the Court of Claims the Government had not filed a counterclaim or in anywise insisted upon its demand by way of set-off against the plaintiff’s claim. In deciding the issue adversely to the Government’s contention it was said (pp. 646-648) :
“ But the United States did not appeal from the judgment of the Court of Claims, nor does it appear that any application in their behalf was made to that court for a new trial, as expressly authorized by an act of Congress. On the contrary, it appears that the United States acquiesced in the judgment and claimed to deduct from it the amount now in controversy as due to the Government for the interval-revenue tax. Such a power is not vested in the Secretary of the Treasury, nor m any other executive officer of the Government, even if it could be; and it is clear that the judgments of this court, rendered on appeal from the Court of Claims, if no such power is conferred by an act of Congress, are beyond all doubt the final determination of the matter in controversy; and it is equally certain that the judgments of the Court of Claims, where no appeal is taken to this court, are, under existing laws, absolutely conclusive of the rights of the parties unless a new trial is granted by that court as provided in the before mentioned act of Congress.[7]
*476 “ Judicial jurisdiction implies the power to hear and determine a cause, and inasmuch as the Constitution does not contemplate that there shall be more than one Supreme Court, it is quite clear that Congress can not subject the judgments of the Supreme Court to the reexamination and revision of any other tribunal or any other department of the Government.
“ Opposed to that is the suggestion that the internal-revenue tax is a lien upon the property taxed, and that the lien, when the property is sold, is transferred to the proceeds of the sale, as in the case of a maritime lien when the res is sold and the proceeds of the sale have been paid into the registry of the court. Whether that is so or not is not a question in this case; but suppose the question is presented, it is a sufficient answer to the suggestion that the United States, if they desire to enforce such a right, must seek some other remedy than the one pursued in the case before the court, as it is clear that when such a claim as that preferred by the claimants in the original petition passes into judgment in a court of competent jurisdiction it ceases to be open, under any existing act of Congress, to revision by any one of the executive departments or of all such departments combined. Remedies such as have been suggested, if seasonable, may be pursued in a proper case, but it will be time enough to decide the question whether any remedy now remains when the solution is properly presented.
“ Should it be suggested that the judgment in question was rendered in the Court of Claims, the answer to the suggestion is that the judgment of the Court of Claims, from which no appeal is taken, is just as conclusive under existing laws as the judgment of the Supreme Court, until it is, set aside on a motion for new trial.”
Thus far we have been considering the general jurisdiction of this court and not its special one. The confusion arising with respect to the case herein involved is unquestionably due to a failure to distinguish between the class of cases over which the court, in virtue of its general jurisdiction exercises judicial power, and the remaining class wherein its jurisdiction does not extend to awarding final judgments. It is well recognized by the statutes, as well as by the decisions of both this and the Supreme Court, that since the reorganization act of 1863, this court exercises two distinct kinds of jurisdiction. Under one it possesses the judicial power to render final judgments from which appeals lay to *477 the Supreme Court, to which class the instant case indisputably belongs, and under the other there can be no final judgment and hence no right of appeal. It has been the policy of Congress with respect to jurisdictional acts concerning this court to continue this dual jurisdiction manifested especially in the enactment of the Tucker Act passed in 1887. In 1868 (15 Stat. 75) Congress enacted an act giving to the United States the right of appeal ‘to the Supreme Court in all cases, irrespective of the amount involved, and abolishing the office of solicitor, providing expressly that thereafter the Department of Justice through the Attorney General or his assistants should represent the Government in all cases before the court.
The Tucker Act to which we just referred, enacted March 3, 1887 (24 Stat. 505), the one most familiar to practitioners, has been for more than forty years the court’s chart and grant of power. The title of this act is significant, “An act to provide for the bringing of suits against the Government of the United States,” a title in sharp contrast to the title of the original -act of 1855, when this tribunal was a court in name only. This act, now embodied in the Judicial Code of 1911 as sections 136 to 187, title “ The Court of Claims,” continued the subject matters over which the court exercises original jurisdiction since the reorganization acts of 1863 and 1866, and added some other subjects. In so far as herein especially pertinent, the act conferred upon .the court general jurisdiction “ upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort,” and jurisdiction was granted to hear and determine all set-offs, counterclaims, claims for damages or other demands which the Government may have against any claimant in said court. Section 150 of the -code provides:
“ Sec. 150. The amount of any final judgment or decree rendered in favor of the claimant, in any case transmitted to the Court of Claims under the two preceding sections, shall be paid out of any specific appropriation applicable to the case, if any such there be; and where no such appropriation exists, the judgment or decree shall be paid in the same manner as other judgments of the said court.”
*478 Section 178 provides:
“Seo. 178. The payment of the amount due by any judgment of the Court of Claims, and of any interest thereon allowed by law, as provided by law, shall be a full discharge to the United States of all claim and demand touching any of the matters involved in the controversy.”
Section 179 provides:
“ Seo. 179. Any final judgment against the claimant on any claim prosecuted as provided in this chapter shall forever bar any further claim or demand against the United States arising out of the matters involved in the controversy.”
Section 181 provides as follows:
“ Seo. 181. The plaintiff or the United States, in any suit brought under the provisions of the section last preceding, shall have the same right of appeal as is conferred under sections two hundred and forty-two and two hundred and forty-three; and such right shall be exercised only within the time and in the manner therein prescribed.”
And section 155 provides:
“ Seo. 155. Aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts, shall have the privilege of prosecuting claims against the United States in the Court of Claims, whereof such court, by reason of their subject matter and character, might take jurisdiction.”
The act expressly repeals all laws or parts of laws inconsistent with its provisions and thus disposes of references under the original act of February 24, 1855 (10 Stat. 612). We do not refer to innumerable acts passed during the period of time between 1863, 1866, and 1875, conferring jurisdiction upon this court to hear, determine, and award judgment in a vast variety of cases, such as Indian claims under treaties and acts of Congress, special acts waiving the statute of limitations and legal defenses of the United States where decisions adverse to plaintiffs have been rendered by this court, because the issue presented by the present pleadings concerns more particularly the fundamental jurisdiction of the court as related to general subject mat *479 ters under section 145 of the judicial Code. We do, however, refer especially to' section 2, a section which confers upon the United States district courts concurrent jurisdiction with the Court of Claims as to all matters named in the sections of the Tucker Act where the amount of the claim does not exceed ten thousand dollars, a law still in force and a jurisdiction invoked by plaintiffs to a very large extent. ; In Campbell v. United States, 107 U. S. 407, 410, 411, 413, the Supreme Court in reversing a judgment of this court in a case involving a right to “ drawbacks ” denied the plaintiff by the Secretary of the Treasury, said:
“ We think the Court of Claims has jurisdiction of such a claim: (1) Because it is founded on a law of Congress, and (2) because the facts found in this case raise an implied contract that the United States will refund to the importer the amount he paid to the Government.
“ The finding of the court is that, by the regulations, this allowance of drawback had been fixed at seventeen cents per hundred pounds.
* * * * *
“ The Court of Claims makes the mistake of supposing that the claim is founded on the regulations of the Secretary of the Treasury. This view can not be sustained. It is the law which gives the right, and the fact that the customs officers refuse to obey these regulations can not defeat a right which the act of Congress gives.
*****
“We are of opinion that the facts found by the Court of Claims establish the right of appellants to recover a judgment for the exported cake at the rate of seventeen cents per hundred pounds; and the cause is remanded with directions to enter such a judgment.”
. In Schillinger v. United States, 155 U. S. 163, 166, the Supreme Court said:
“ Until the organization of the Court of Claims by .the act of February 24, 1855, c. 122, 10 Stat. 612, the only recourse of claimants was in an appeal to Congress. That act defines the claims which could be submitted to the Court of Claims for adjudication as follows: * *
Speaking of the jurisdiction of this court in a case involving the issue in United States v. Borcherling, 185 U. S. 223, 234, it was said:
*480 "It is not open to doubt that the Court of Claims has jurisdiction to entertain the claim of the receiver to receive the fund, the title to which had thus become vested in him. The jurisdiction of that court extends throughout the United States. It issues writs to every part of the United States, and is specially authorized to enforce them. 10 Stat. 612, c. 122, sec. 3. By establishing this court, the United States created a tribunal to determine the right to receive moneys due by the Government. Such legislation did not leave the Treasury or its officers free to arbitrarily select, between conflicting claimants, the one to whom payment should be made." -
See also Medbury v. United States, 173 U. S. 492; McLean case, 226 U. S. 374; Dooley v. United States, 182 U. S. 222. In Hartsville Mill v. United States, 271 U. S. 43, 44, 45, a case involving jurisdiction under sections 145 and 151 of the Judicial Code, the Supre~ne Court held as follows:
"On February 5, 1923, a bill (S. 4479) was introduced in the Senate authorizing and directing the Secretary of the Treasury to pay to two hundred and eighty-five named persons, firms, and corporations, including the appellant, ` which entered into contracts with the United States of America through the agency of the United States Ordnance Department, which contracts were canceled by said Ordnance Department, the several sums set opposite their names.' By Senate resolution of March 3, 1923, the bill, with accompanying documents, was referred to the Court of Claims for consideration and report. Jud. Code, § 151. Appellant filed its petition in the Court of Claims, referring to the Senate bill and resolution and setting up a claim upon a contract of September 26, 1918, for the sale of cotton linters to the Government. The Court of Claims held, upon the facts found, that it had jurisdiction to render a judgment under the provisions of chapter 7 of the Judicial Code; that the plaintiff was not entitled to recover upon its claim, and entered judgment dismissing the petition.
"The case comes here on appeal. Jud. Code, § 242, before its repeal by the act of February 13, 1925.
"The petition sets out a cause of action for failure of the Government to perform its contract of September 26, 1q18, and, by way of anticipation of a defense, alleges that .a later contract of December 31, 1918, between appellant and th~ Government, purporting to cancel the earlier contract, was procured by duress and was without consideration. The jurisdiction to hear and determine the claim is conferred by *481 Jud. Code, § 145, and was not enlarged or otherwise affected by the Senate resolution.”
Prior to the enactment of the Tucker Act the jurisdiction of this court to award judgment for the value of private property taken by the United States for a public use was predicated upon the principle of an implied contract, Great Falls case, 112 U. S. 645, and this principle of adjudication continued for some time subsequent to the enactment of the act. North American T. & T. Co. case, 253 U. S. 330; Klebe case, 263 U. S. 188. However, during the recent war the right to compensation was recognized as founded upon the Constitution. Brooks-Scanlon Corp. v. United States, 265 U. S. 106; Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299. In Monongahela Nav. Co. v. United States, 148 U. S. 312, Congress, in directing the expropriation of the company’s property, prescribed that certain elements should not be considered in determining just compensation. The Supreme Court said (p. 321) :
“ By this legislation, Congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial 'and not a legislative question. The legislature may determine what private property is needed for public purposes, * * * but when the taking has been ordered, then the question of compensation is judicial. * * * The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.”
Some of the cases cited above arose in the United States district courts, constitutional courts proceeding under the concurrent jurisdiction with the Court of Claims under the Tucker Act. Assuredly they were exercising judicial power, and it is difficult to perceive wherein the Court of Claims under like jurisdictional authority is not exercising to the same extent and character judicial power. - Innumerable cases, far too many to mention, prosecuted in this court upon rights alleged to accrue and founded upon any law of Congress, involve for their adjudication the undoubted exercise of judicial power. Medbury's case, supra. Tax cases now familiar and extensive, originating in this court involving *482 complicated issues of law and facts, are susceptible to no other solution than principles of law. A claim founded upon a law of Congress indispensably involves the construction of the law of its origin. In Kaufman’s case, 96 U. S. 567, 570, it is said:
“ Here the right has been given, and a liability founded upon a law of Congress created. Of such liabilities the Court of Claims has jurisdiction, and no other remedy has been provided.”
In contract cases it was early decided that the rules of law applicable to contracts between individuals apply to authorized contracts with the Government — that as to these, the Government abandons its sovereignty and submits the claim to adjudication as in other cases of contract. - United States v. State Bank, 96 U. S. 30. Pa'tent cases involving) user under contracts and for infringement under the act of June 25, 1910, as amended by the act of July 1, 1918, are especially limited in many instances to issues of law. Montgomery v. United States, 65 C. Cls. 526; Allgrunn's case, 67 C. Cls. 1; United States v. Harvey Steel Co., 196 U. S. 310; United States v. Société Anonyme, 224 U. S. 309; Richmond Screw Anchor Co. v. United States, 275 U. S. 331. This court may exercise equity jurisdiction to the extent of reforming contracts and base its decree upon the contract as reformed. Milliken Imprinting Co. case, 202 U. S. 168; Acherlind case, 240 U. S. 531. This court has awarded the United States many judgments upon counterclaims and set-offs against the plaintiff’s demands, and said judgments may be and have been enforced through certification of the same to the United States district court of the district where the plaintiff resides or property is located. Allen case, 17 Wall. 207; Standard Transportation Co. case, 61 C. Cls. 906; McElrath case, 102 U. S. 426. Judgments have been awarded and denied by this court under section 155 of the Judicial Code to subjects of practically all the leading foreign countries of the world. United States v. Diekelman, 92 U. S. 520; Hamburg-American Co. v. United States, 277 U. S. 138; Brodie case, 62 C. Cls. 29. In United States v. Harmon, 147 U. S. 268, 272, the suit was under the Tucker Act in a *483 circuit court of the United States. It was for the recovery of certain fees alleged to be due as marshal of the United States. A judgment in favor of the marshal was contested upon the provisions of an act which provided “ that nothing in this section shall be construed as giving to either of the courts herein mentioned jurisdiction to hear and determine claims growing out of the late Civil War, and commonly known as ‘ war claims,’ or to hear and determine other claims which have heretofore been rejected, or reported on adversely, by any court, department, or commission authorized to hear and determine the same,” and the Supreme Court, in affirming the decision of the circuit court, said (pp. 215, 276) :
“ The judgments of the Court of Claims, and of the Supreme Court on appeal from its decisions, accord with this view, and uniformly treat the action of the accounting officers as not conclusive in a suit between the United States and the individual. MoElrath v. United States, 12 C. Cl. 201, and 102 U. S. 426, 441; Chorpenning v. United States, 11 C. Cl. 625, and 94 U. S. 397, 399; Pittsburg Savings Bank v. United States, 16 C. Cl. 335, 351, 352, and 104 U. S. 728, 734; Wallace v. United States, 20 C. Cl. 273, and 116 U. S. 398; Saunders v. United States, 21 C. Cl. 408, and 120 U. S. 126.
“ In § 1 of the act of March 3, 1887, c. 359, the words £ hear and determine ’ are used four times; once as applied to the Court of Claims, twice as applied to that court and to the circuit and district courts, and again as applied to ‘ any court, department, or commission.’ These words must be taken to be used in each instance in the same sense, and as implying an adjudication conclusive as between the parties, in the nature of a judgment or award. The proviso that nothing in this section shall be construed as giving to either of the courts named in .the act jurisdiction to hear and determine any claims ‘ which have heretofore been rejected, or reported on adversely, by any court, department, or commission authorized to hear and determine the same ’ must be limited to a rejection of a claim, or an adverse report thereon, by a court, department, or commission, which determines the rights of the parties, such as the' approval by the Secretary of the Treasury of an account of expenses under the captured and abandoned property acts, as in United States v. Johnston, 124 U. S. 236, or the decision of an international commission, as in Meade v. United States, 9 Wall. 691.
“ Moreover, the Court of Claims, even before the passage of the act of 1887, had jurisdiction of claims under an act *484 of Congress or under a contract, and could therefore hear and determine claims for legal salaries or fees. Mitchell v. United States, 18 C. Cl. 281, and 109 U. S. 146; Adams v. United States, 20 C. Cl. 115; United States v. McDonald, 128 U. S. 471; United States v. Jones, 131 U. S. 1, 16.
“We can not believe that the act of 1887, entitled ‘An act to provide for the bringing of suits against the Government of the United States,’ and the manifest scope and purpose of which are to extend the liability of the Government to be sued, was intended to take away a jurisdiction already existing, and to give to the decisions of accounting officers an authority and effect which they never had before.”
We have gone exhaustively into this subject, not because of any abiding doubt as to the extent of our jurisdiction under section 145 of the Judicial Code, and the effect of the jurisdictional act upon the rights of plaintiffs and the United States. What we have said has been prompted by a statement made to the appropriations committee of the Senate then having under consideration an appropriation for the payment of the judgment in this case, to the effect that this court “ is not a constitutional court and has no authority to render a binding judgment against the United States. * * * In so directing the Court of Claims in such a matter the Congress would be doing no more than would be involved in referring a matter back to one of its own committees for further consideration and report or in directing the General Accounting Office, likewise an agency of the Congress, to make further investigation or to give further consideration to some matter it had reported upon to the Congress.” The absolute misconception of the jurisdiction of this court under the general jurisdiction provisions of section 145 of the code may have arisen over other provisions of the.Tucker Act which do in a limited way expressly withhold from our findings the effect of a binding judgment against the United States. The original act of 1855 evidences by its provisions that Congress found it a matter of justice to itself and citizens of the United States having private claims to delegate to an independent tribunal the power and authority to investigate the same in a quasi-judicial capacity, but without authority to bind the United States. The policy was, as we have previously *485 said, an advance step, experimental to an extent, put forward doubtlessly to first anticipate the result in view of additional legislation upon the same subject matter. We say this for subsequent proceedings warrant the inference, and it is common knowledge that at that time, as well as now, the Government possessed an accounting department and other independent establishments — not courts — to whom claims could have been referred. The act of March 3, 1863 — (supra), created a court. It is true the terms of section 14 precluded an appeal from the judgments of this court to the Supreme Court, but the express terms of the act leave no room for doubt that it was the intent and purpose of Congress to submit private claims of citizens of the United States to a judicial forum where the respective rights of the parties might be adjudicated according to law and under the procedure of common law courts. Whatever doubt might exist as to the correctness of the above assertion is effectively dispelled by the act of 1866 (supra), legislation directed to this precise point, designed and intended to remove all doubt as to the finality and binding effect of judgments of this court under its general jurisdictional powers. The Tucker Act of 1887 (supra) to a large extent remodels and recasts the jurisdiction of this court. This statute obviously enlarges its authority and in some instances removes certain subject matters, but by its terms a citizen having a private claim against the United States cognizable under the act may file his petition in this court praying for a judgment against the United States without having resorted to Congress or procured legislative action with respect. thereto in any manner whatsoever. It is axiomatic that the United States may not be sued save by its own consent and upon such terms and conditions as Congress may see fit to impose, but surely it may not be contended that the United States may not consent to be sued or that Congress may not by appropriate legislation grant authority and jurisdiction to a judicial tribunal established for that precise purpose to hear, adjudicate, and render final judgment in a particular class of cases committed to it by law. In Minnesota v. Hitchcock, 185 U. S. 373, 386, it is said:
*486 “ While the United States as a Government may not be sued without its consent, yet with its consent it may be sued, and the judicial power of the United States extends to such a controversy. Indeed, the whole jurisdiction of the Court of Claims rests upon this proposition.”'
• See also Haycraft's case, 22 Wall. 81. To hold to the contrary would pervert what was said by the Supreme Court in the case of United States v. Emery, 231 U. S. 28, 31, 32, a tax case, as follows:
“ The jurisdiction over suits against the United States under § 24, Twentieth, of the Judicial Code, extends to £ all claims not exceeding ten thousand dollars founded upon the Constitution of the United States or any law of Congress.’ However gradually the result may have been approached in the earlier cases, it now has become accepted law that claims like the present are ‘ founded upon ’ the revenue law. The argument that there is a distinction between claims ‘ arising under ’ (Judicial Code, § 24, First) and those ‘ founded upon ’ (id., § 24, Twentieth), a law of the United States, rests on the inadmissible premise that the great act of justice embodied in the jurisdiction of the Court of Claims is to be construed strictly and read with an adverse eye. Dooley v. United States, 182 U. S. 222, 228; United States v. Hvoslef, March 22, 1915, ante, p. 1. Jurisdiction was taken for granted in United States v. N. Y. & Cuba S. S. Co., 200 U. S. 488, and was upheld in Christie-Street Commission Co. v. United States, 136 Fed. Rep. 326; United States v. Hyams, 146 Fed. Pep. 15, 18; United States v. Finch, 201 Fed. Rep. 95, 97.”
It is idle to assert that under the general jurisdiction of this court the controversies submitted for adjudication do not involve justiciable issues, notwithstanding their susceptibility to settlement by Congress, in the absence of a judicial tribunal with jurisdiction to adjudicate them. To remove such a class of cases from a legislative to a judicial forum was the especial purpose of the Tucker Act. What Congress desired was a judicial determination of liability in the same manner as suits between individuals so that a justiciable claim against the United States, if established, under judicial procedure would determine the respective rights of the parties. Contract cases concerning contractual liability, cases arising under acts of Congress, are confined *487 to the established and lawful rule of statutory construction and cases under the Constitution are in a similar situation. As a matter of fact, legislative history with respect to the general jurisdiction of this court and the finality of its judgments indicate clearly a congressional intent and purpose to grant larger judicial power and authority upon the court as demands increase against the Government and their importance magnifies. Section 180 of the Judicial Code, title, The Court of Claims. During and following the close of the World War Congress conferred upon the court jurisdiction to adjudicate to final judgment, with the right to petition the Supreme Court for a writ of certiorari, cases involving the requisition and taking of contracts and other property by the Government, also appeals from awards by the Secretary of War under the Dent Act, patent cases where under the statute applications for patents had been kept secret but used by the Government preceding the allowance of patent rights, and in numerous other instances occasioned by the Government’s war activities wherein the lawful property rights of citizens were directly concerned. Myers case, 272 U. S. 52.
From the creation of this court until now it has possessed a character of jurisdiction under acts of Congress quite distinct from its general jurisdiction under section 145 of the Judicial Code, and therein resides a misconception of the court’s jurisdiction and its procedure. ' When the court was created and for many decades after it came into existence the various departments of the Government were not supplied with the same extensive and competent legal divisions and officials which now direct and pass upon their legal affairs, and doubtless Congress intended by section 148 of the Judicial Code to confer upon this court jurisdiction to render advisoj:y.h.pinions, when solicited under the section, to the various executive departments of the Government because of this situation. The practically negligible number of cases reaching this court in later times under the above section substantiates what has been said. Section 151 of the Judicial Code is a jurisdictional act similar in character to section 148. This section is a reenact *488 ment of section 14 of the Tucker Act of 1887 as the same was amended by the act of June 25, 1910. By the express terms of the section if any bill, except for a pension, is pending in either House of Congress providing for the payment of a claim against the United States, legal or equitable, or for a grant, gift, or bounty to any person, the House in which such bill is pending may, for the investigation and determination of facts, refer the same to the Court of Claims, who shall proceed with the same in accord with established rule and report the facts to the House referring •such a bill, “ Provided, however, That if it shall appear to the' satisfaction of the court upon the facts established, that under existing laws or the provisions of this chapter, the subject matter of the bill is such that it has jurisdiction to render judgment or decree thereon, it shall proceed to do so, giving to either party such further opportunity for hearing as in its judgment justice shall require, and it shall report its proceedings therein to the House of Congress by which the same was referi’ed to said court (36 Stát. L. 1138).”
The above section of the code, as well as the antecedent Bowman Act of 1883 and Tucker Act of 1887, has been many times before this court and and decisions as to its scope and meaning are numerous. We do not propose to cite them all. It is sufficient in the first instance to note that the act itself confers a twofold jurisdiction upon the court, one decidedly advisory if the claim falls without the court’s general jurisdiction, and another exacting final judgment if the facts bring the case within our general jurisdiction. In one instance the court’s action is expressly restricted to the functions of a jury in the form of a special verdict designed and intended to aid Congress as to future proceedings with reference to the case; in the other instance the court receives a mandatory direction to act judicially and adjudicate the rights of the parties to final judgment, a striking illustration of congressional intent to confer judicial power upon this court in cases involving justiciable issues. In the case of Stovall v. United States, 26 C. Cls. *489 226, 233, this court said, with reference to a similar provision of tbe then 13th section of the Tucker Act, that—
“ The relations of Congress and this court concerning claims are now much like those which exist, or once existed, between courts of equity and courts of law. If it be necessary in equity to determine contested facts in certain cases, the court will frame issues and send them to a court of law to be tried by a jury. Such, in effect, is the remedy provided by the Bowman Act. Either of the Houses of Congress or one of its committees can send a claim for — what is equivalent to a verdict of a jury — a finding of the facts upon issues joined and regularly tried, after which the claim will go back to Congress for such relief as the legislative authority may deem legal, just, or equitable.
“Again, a suitor can not go into equity for relief if he has a remedy at law. That principle seems engrafted on the system by this provision of the Tucker Act. If the case be one which might have been» brought in a legal tribunal, the intimation of the statute is that the claimant should have asserted his legal rights there, and that Congress shall not be troubled further with the claim. It follows that the claimant must stand or fall with his legal rights; that the relief of the one party must be restricted to the obligations of the other; that the damages can not be discretionary, as in Congress, and that there can be no relief for the claimant until he has established, like other plaintiffs in other cases, a legal liability on the part of the defendants.” Hartsville Mill case, supra.
There can be no mistaking the intent and purpose of section 151 of the code. Either House of Congress may unquestionably refer a bill of the class stated to this court for what may be termed advisory action or opinion to the extent designated, and if the facts establish a case falling outside the proviso the action of the court is in no sense final. The reference to the court of the class of bills is accomplished by one branch of Congress, i. e., either the Senate or House, acting independently and includes within its purview claims for gifts, grants, or bounty clearly indicating an intent to restrict the reference in so far as findings of fact are concerned, to the specific class of cases wherein there exists no legal liability upon the part of the United States to pay the same if suable, but if suable under established law a judgment is to be awarded. Claims barred by the statute of *490 limitations, bills for the payment of claims, irrespective of the status of the claimant, including every character of alleged demand except for pensions, might have been referred to this court prior to the adoption of the Crawford amendment, under the above section of the code, and it was because of the vast number of references of this character that enabled an erroneous opinion to exist that this character of jurisdiction represented the power and authority of this court and limited its activities to advisory findings of fact and opinions, without power to conclude the lawful rights of the parties litigant in any case. Dowdy v. United States, 26 C. Cls. 220; Balmer, Id. 82; Brandon v. United States, 46 C. Cls. 559; Hunt v. United States, 45 C. Cls. 566; Montgomery v. United States, 49 C. Cls. 574.
On June 25, 1910 (36 Stat. 837), Congress amended the 14th section of the Tucker Act conferring jurisdiction upon the court to not only find the facts in the case but to report as part thereof such conclusions of the court “ as shall be sufficient to inform Congress of the nature and character of the demand, either as a claim, legal or equitable, or as a gratuity, against the United States,” a provision of law which expressly exacts advisory conclusions with respect to the class of cases referred to the court by its terms. The court considered a vast number of cases under the 14th section of the Tucker Act and they were duly reported to Congress, where so-called omnibus claims bills were reported looking toward their payment. Each omnibus appropriation bill met with opposition and as a result appropriations were delayed at timies over a long period of years, increasing-in amounts as time went by. In 1915 the claims so reported over a period of ten years during which time no appropriation for their payment had been made, accumulated to the total amount of $1,863,259.04, and Congress by act approved March 4, 1915, appropriated a sum sufficient to pay the same, inserting in the act section 5 thereof known as the Crawford Amendmient, which in terms provided as follows (38 Stat. 962, 996) :
“ That from and after the passage and approval of this Act the jurisdiction of the Court of Claims shall not extend to or include any claim against the United States based *491 upon or growing out of the destruction of any property or damage done to any property by the military or naval forces of the United States during the war for the suppression of the rebellion; nor to any claim for stores and supplies taken by or furnished to or for the use of the military or naval forces of the United States, nor to any claim for the value of any use and occupation of any real estate by the military or naval forces of the United States during said war; nor shall said Court of Claims have jurisdiction of any claim which is now barred by the provisions of any law of the United States.”
■ The court’s contact with Congress by reason of the report of these references vast in number, undoubtedly caused an erroneous opinion to prevail in Congress that this class of claims wq,s the only class cognizable by the court and the only jurisdiction the court exercised.
In the case of Chase v. United States, 50 C. Cls. 293, the court in a carefully prepared opinion reviewed in detail its jurisdiction under the 14th section of the Tucker and other acts similar in their general provisions to the 14th section of the Tucker Act, and with respect to the Crawford Amendment held that it operated to repeal pro tanto the' provisions of section 151 of the Judicial Code (the fourteenth section of the Tucker Act), so far as the jurisdiction of the court is concerned, Insurance Co. v. Ritchie, 5 Wall. 541, 544, leaving that section operative as to claims not within the purview of the Crawford Amendment, the court also holding that by the terms of the amendment all cases pending as well as future ones came within its terms. Nothing, we think, could more conclusively index the twofold jurisdiction of this court, a grant of jurisdiction segregated expressly by the acts conferring it into distinct activities, one involving advisory conclusions and the other the exercise of judicial power by awarding final judgment from which under the act of 1925 a petition to the Supreme Court for a writ of certiorari lies. Under the first part of section 151 of the code the Government does not consent to be sued in a court, but expressly makes such claims subject to its final legislative action; in the class of cases under the proviso of sections 145 and 151 of the code the Government does expressly consent to be sued, divests itself pro tcmto *492 of its sovereign rights of immunity from suit, and independent of legislative action or appeal to Congress affords the citizen a lawful right to have his claims against the Government adjudicated in the same manner and under the same laws applying with equal force to both the citizen and his Government. In re Sanborn, 148 U. S. 222. Under section 151 of the code either House of Congress may refer a claim to this court in accord with its term’s, but neither the Senate nor the House acting separately can authorize this court to adjudicate such a claim and render a final judgment. Ayres v. United States, 42 C. Cls. 385, 44 C. Cls. 48; Id. 110. The general jurisdictional act marks out a course of judicial procedure granting the right of review by the Supreme Court from all such final judgments the ^ame as any other suitor in a court of justice.
It was contended that the case of Ex parte Bakelite Corporation, 279 U. S. 438, negatives any authority of this court to render final judgment against the United States, and that at the most, whatever the court decides in any case is merely advisory to Congress. The Bakelite .case did not originate in this court and has no application whatever to the issues involved herein. The Bakelite Corporation applied to the Supreme Court for a writ of prohibition directed to the Court of Customs Appeals prohibiting it from entertaining an appeal from certain findings of the Tariff Commission. Under section 316 of the tariff act of 1922 the Tariff Commission was invested with authority to “ assist the President ” in determining whether unfair acts and methods of competition were practiced by any importer of merchandise against whom such a charge had been lodged. To this end the commission was by the act empowered to hear testimony and make findings of fact, and if the findings established the guilt of the importer the act gave the right of appeal on his behalf to the Court of Customs Appeals on questions of law affecting the findings. The Bakelite Corporation made such charges and they were sustained by the findings of the Tariff Commission and from said adverse findings the importers appealed to the Court of Customs, now the Court of Customs and Patent Appeals. The Court of Customs Appeals up *493 held its jurisdiction to entertain the appeal, and the Bakelite Corporation, seeking to prevent further proceedings in this respect, petitioned the Supreme Court for a writ of prohibition predicating its right to the writ upon the contention, among others (p. 448), “That the Court of Customs Appeals is an inferior court created by Congress under section 1 of Article III of the Constitution, and as such it can have no jurisdiction of any proceeding which is not a case or controversy within the meaning of section 2 of the same article.” In determining this issue the Supreme Court held that the Court of Customs Appeals, the Court of Claims, and the courts of the District of Columbia are legislative and not constitutional courts and hence could be invested by Congress with jurisdiction to render advisory opinions, whereas a constitutional court could not be so required. There is nothing in the opinion either in reference to this or the various other courts mentioned which holds that a legislative court may not be invested by acts of Congress over subject matters exacting the exercise of judicial power, nor no suggestion that the source of the power to create such courts deprives them in any and all instances from rendering final judgments in cases where jurisdictional acts confer such power. The challenge to the jurisdiction of the Court of Customs Appeals was rested upon an absolute constitutional inhibition to entertain appeals and render opinions advisory in character and dependent for conclusiveness upon future acts, an issue distinct from the one herein involved. Surely it may not be said that the jurisdiction conferred upon the courts of the District of Columbia in litigation involving not only the residents of the District but the United States as well, deprives these courts of the exercise of judicial functions, or converts them into unusual judicial tribunals, and their judgments merely advisory simply because the congressional authority to create them is derived from the exclusive jurisdiction of Congress over the District of Columbia. As a matter of fact, the Supreme Court said in the 'Bdkelite case, with reference to the jurisdiction of the Court of Claims, “From the outset Congress has required it to give merely advisory decisions on many matters. Under the act *494 creating it all of its decisions were to be of that nature. Afterwards some were to have effect as binding judgments, but others were still to be merely advisory. This is true at the present time.” (Italics inserted.) (P. 454.) See also in this connection and with reference to this subject the case of Old Colony Trust Co. v. Commissioner, etc., 279 U. S. 716.
Section 288 of the Code of the United States, page 900, Title 28, grants this court authority to certify questions of law to the Supreme Court in any case instituted before it under its general jurisdiction. Subdivisions (b) and (c) of section 288 are as follows:
“(b) In any case in the Court of Claims, including those begun under section 287, it shall be £omgetent,for the Supreme Court, upon the petition of miner party, whether Government or claimant, to require, by certiorari, that'the cause, including the findings of fact and"the judgment or decree, but omitting the evidence, be certified to it for review and determination with the same power and author-,, ity, and with like effect, as if the cause ha^‘ been brought there by appeal. ' ' “
“ (c) All judgments and decrees of the Court of Claims shall be subject to review by the Supreme Court as provided in this section, and not otherwise.”
The issue in the instant case is whether this court has under its general jurisdiction power to render a judgment binding upon the United States, whether Congress by the enactment of section 145 of the Judicial Code conferred upon this court power to render judgments which are not advisory but final, and which under the jurisdictional act and the law render its final decision res adjudicata, and that issue was not involved in the Bahelite case. ' This court during all its long .existence has never doubted the authority of Congress to exact merely advisory opinions in all proper cases, it does not now doubt it; what is'of more vital and far-reaching consequence is the challenge to the court’s jurisdiction to render a final judgment under its general jurisdiction act, section 145, invoked by the Pocono Pines Assembly Hotels Company and heard and adjudicated by the court under that section of the Judicial Code. ¡
*495 of Claims, as well as all other inferior legislative or constitutional courts, is, “ as respects its organization and existence, undoubtedly and completely under the control of Congress.” Congress must organize such courts and Congress may determine their existence. Congress abolished in 1911 the United States circuit courts, admittedly constitutional courts of the United States, and the Commerce Court of the United States, a court which under the BaJeelite decision would have been a legislative court. The word “ control ” has no reference to the right to direct decisions. Martin v. Hunter, 1 Wheat. 328. Just why the case of Murphy v. United States, 35 C. Cls. 494, was cited as authority to sustain the action of Congress in the Poconp Pines Hotel Go. case is difficult to perceive. The Murphy case exemplifies the undoubted legislative power of Congress to waive defenses it may have had to a case adjudicated by this court under its general jurisdiction and confer upon the court a special jurisdiction which it did not possess when the case was originally decided. Murphy had failed to procure a judgment against the United States. Congress by special act conferred upon the court equitable jurisdiction which it did not have before, waived the statute of limitations, and thereby waived its substantial defenses to the case which had been primarily interposed in opposition to Murphy’s right to a judgment. Of course, Congress may by special act waive any defense it may have, either legal or equitable, to a suit in this court. By so doing, no rights of the person asserting the claim are prejudiced and no property rights invaded. On the contrary, they are enlarged. A pronounced and vitally different situation exists where the plaintiff has procured a valid judgment against the UniterTStates and it is sought to subject its. permanency to the hazard of a new trial. A judgment if lawful is property . and so recognized by law. Congress has frequently waived • by special act defenses which were available to the United States in the prosecution of claims in this court. Suits of Indian tribes invariably involve the statute of limitations and legal and equitable rights. Numerous cases, quite too many to cite, may be found in the reports of the court where *496 Congress impressed with the equitable justice of the plaintiff’s demand, and convinced that save for technical defenses the plaintiff would have recovered judgment, has waived the same by special act and the cases have been adjudicated by this court under such acts. Such proceedings and the jurisdiction of the court with respect thereto bear no analogy whatever to the situation involved in the present controversy. Cherokee Nation v. United States, 270 U. S. 476, wherein it was held that Congress possessed full power to waive the benefit of res adjudieata by passing a special act and allowing another trial against the United States. The case of Bodkin v. United States, 67 C. Cls. 281, falls within the same category as the Murphy ease, supra. The original claimant to public lands of the United States in the Bodkin ease lost his case in the courts, and Congress was seeking from this court a finding of facts as to the value of the lands lost, with a view of determining whether, despite an adverse decision of the courts, the claimant should be reimbursed and the United States waive its rights under the principle of res adjudieata and pay the claim, a case where assertions were made of a change of status bringing the plaintiff within the decision of the courts with respect to the facts, but precluded from access to the courts because of lapse of time, a purely legislative matter. 280 U. S. 572. See also Butler Lumber Co. v. United States, No. J-547, decided December 7, 1931. [Ante, p. 270.]
The legislation challenged by the plaintiff in the instant case was, as disclosed by the committee report and proceedings, brought about by a report solicited by the committee which went at some length into the history and jurisdiction of this court. We refer to this report and proceedings not alone to disclose what we believe to be erroneous conclusions therein, but for the additional purpose of ascertaining the scope and intent of the act about which this case revolves. Binns v. United States, 194 U. S. 486, 495. First, it is inaccurate to state that the final judgment in the Poeono Pines Assembly Motels ease was rendered without the court having before it the facts of the case. The court had before it the testimony offered by the plaintiff and *497 defendant, and precisely the same facts presented to the committee. The motions for new trials recited these identical facts and, as previously stated, the court deemed them insufficient from a probative standpoint to change the result. Again, it was asserted that the court’s “judgments must be submitted to the Congress and may not be paid unless the Congress makes specific appropriations.” Section 150 of the code provides for the payment of the court’s judgments, and as a matter..of.fact, final judgments, of this ..court are and have'Been paid out of regular current apprn-priations available to pay the same, and up to 1872 or 1873 this was the prevailing course. Judgments of this court in tax cases are paid by the disbursing clerk of the Treasury Department out of current appropriations known as appropriations for “ Refunding taxes illegally collected.” The payment of a final judgment in the event of no available appropriation to satisfy the same depends upon an appropriation by Congress, and so it is true as to judgments of the district courts, circuit courts of appeals, and Supreme Court of the United States, where the United States is defendant. Judgments of the courts of the District of Columbia, as well as the Court of Customs and Patent Appeals, involving satisfaction by way of money, are in precisely the same category. Article I, section 9, par. 6, of the Constitution.-
Again it was said that the act of September 30, 1890 (26 Stat. 504), revived the provisions of section 14 of the act of March 3, 1863, in reference to the judgments of the Court of Claims. A simple reading of the act is sufficient to refute this contention. The act reads as follows (p. 537) :
“ That hereafter it shall be the duty of the Secretary of the Treasury to certify to Congress for appropriation only such judgments of the Court of Claims as are not to be appealed, or such appealed cases as shall have been decided by the Supreme Court to be due and payable. And on judgments in favor of claimants which have been appealed by the United States and affirmed by the Supreme Court, interest, at the rate of 4 per cent per annum, shall be allowed and paid from the date of filing the transcript of judgment in the Treasury Department up to and including the date of *498 the mandate of affirmance by the Supreme Court: Provided, That in no case shall interest be allowed after the term of the Supreme Court at which said judgment was affirmed.”
As a legal proposition it has never been thought that failure to receive payment of a judgment affected its validity. If Congress possesses the power to make the United States a defendant in a court of the United States the exercise of the power undoubtedly carries with it the incidents of legal liability. Innumerable debtors may lawfully escape the payment of valid judgments but no one has supposed that such exemptions affect the validity of the court’s judgment if it is otherwise valid in law.i It is to be especially noted that the legislation upon which the present controversy rests is the final outgrowth of a committee amendment first offered to the second deficiency appropriation bill pending in the Senate on February 25, 1931, which amendment was rejected on a point of order. , This rejected amendment reads as follows:
“ The United States Court of Claims be, and it is hereby, authorized and directed, notwithstanding any rule of court, proceedings had, or provision of law to the contrary, to grant the United States a new trial in the case of Pocono Pines Assembly Hotels Co. v. United States of America, No. J-543, and hear the testimony, find the facts, and render judgment accordingly on the matter of the responsibility under the facts and the provisions of the lease agreement involved for the fires and the damage and destruction of leased property thereby which occurred during the lease term. The Department of Justice is hereby authorized and directed on behalf of the United States, defendant in said action, to present to the Court of Claims all available evidence bearing upon the cause and origin of said fires and such other matters as will fully protect the interests of the United States therein. Any right in either party to said action to obtain review by the Supreme» Court of the United States of the proceedings had pursuant hereto shall not be curtailed by any provision hereof.”
The language employed in the rejected amendment is precise and free from ambiguity; its purpose and intent may not be misconstrued. The challenge as to its validity went uncontradicted, in so far as it was predicated upon the exercise of judicial power by Congress. Contentions as *499 to its validity were predicated upon this court’s jurisdiction and the finality of its judgments. It nowhere appears that any suggestion was advanced that in the enactment of such legislation with reference to a court other than this one it would be aught else than the exercise by Congress of judicial and not legislative power. The court is of the unanimous opinion that if this were the sole issue in this case, the plaintiff’s motion to vacate the order of reference heretofore made would have to be allowed. In keeping with established precedents and in accord with what the law establishes, there is but one tribunal of the United States which may direct this court to grant a new trial in a case adjudicated by this court under section 145 of the judicial code, and that tribunal is the Supreme Court of the United States. Said rejected amendment, in our view of the case, was predicated upon a misconception and a confusion of the dual character of this court’s jurisdiction under laws of Congress conferring the same, as heretofore noted. ' The difficulty which the court encounters is not with reference to the constitutional power of Congress to legislate with respect to the subject matter directly at issue in virtue of the motion now under consideration, but arises from what in the court’s opinion was the intent and purpose of the final legislation enacted and which taken in accord with the express terms employed would, without taking into consideration the circumstances under which it was enacted, leave ample room for the contention which the plaintiff insists upon. This amendment heretofore quoted, being the act involved in this ease, is as follows:
“ The case of the Pocono Pines Assembly Hotels Company against United States of America, Number «J-543 be, and hereby is, remanded to the United States Court of Claims with complete authority, the statute of limitations or rule of procedure to the contrary notwithstanding, to hear testimony as to the actual facts involved in the litigation and with instructions to report its finding of facts to Congress at the earliest practicable moment.”
The technical words of this amendment are susceptible to a construction that a case is remanded to- this court which involves a second proceeding akin to, if not in effect, a *500 new trial, and for the reasons above pointed out would undoubtedly be objectionable. This effect, however, we do not believe Congress intended to accomplish. .The question pending in Congress was the issue of appropriating public funds, a purely legislative matter. An appropriation had not been made by the House of Representatives, and the Senate, in which body the act in controversy originated, was obviously unwilling to appropriate without additional information with respect to facts out of which the case arose. There was no manifestation of an intent, to do the plaintiff an injury, no investigation instigated as to the legality of the court’s judgment, no command issued to the court to reverse its conception of the legal principles adjudicated by it, but, on the contrary, as we gather from the reports of the committee and the debates in Congress (Congressional Record) February 25, 1931, 71st Congress, 3rd session, pages 5939-5942; 5945; 5949-5956, and February 26, 1931, pages 6070-6084) the act intended to obtain for Congress certain facts upon which it may determine its legislative course, legislation which Congress deemed essential in view of representations made that it did not have available for consideration sufficient facts necessary for legislative action. The act is in its essence legislation respecting an appropriation for the payment of a valid existing final judgment of this court, an ancillary proceeding of a legislative body indispensable under the Constitution;' apart from judicial proceedings, to liquidate final judgments against the United-States awarded by this or any other court of the United States?) As was said prior to the passage of the act “ it is free from any implication,” and contrary to the first amendment proposed does not seek to set aside a judgment of mis court. It is true the act does not seek an advisory opinion; its purpose is the ascertainment of findings of fact, a proceeding akin to the act in the case of The Yankton Sioux v. United States, 53 C. Cls. 67, what we might term a semi-judicial proceeding, i. e., the facts found are to be found in accord with established rules of evidence, without judicial authority to rest liability thereon, a delegation to this court of authority to proceed as an aid to Congress in, as pre *501 viously observed, its legislative course. In keeping with what we have said, the facts disclosed under the reference will not in any way be considered by the court as changing in any respect the findings of fact found in case No. J-543 or the conclusions of law and judgment awarded the plaintiff by the court. This judgment and the findings found, in our opinion, are conclusive of the rights of the parties under the law and the decisions of the Supreme Court. It is a familiar rule of statutory construction that the letter of the statute must be construed in the light of the legislative intent. A thing may well be -tfdthin the letter of a law and clearly not within the legislative intent. Here we have a situation which if it exacts adherence to the precise letter of the law we would be bound to hold that the purpose accomplished is not materially different from the first proposed amendment. The words “ remanded ” and “ The case of the Pocono Pines Assembly Hotels Company against the United States of America, Number J-543,” possess a fixed technical significance and meaning in the law of procedure. Nevertheless, taking the act as a whole in conjunction with the circumstances attending its enactment, as well as the surplus provisions respecting the waiver of the statute of limitations, . we do not believe Congress intended to remand a case, but, on the contrary, was seeking to ascertain certain facts with respect to appropriating public funds of the United States, and no other purpose, a separate and distinct law concerned only with legislation and not with judicial action.
This court has found the facts in case No. J-543 as it is directed to find them by the rules of the Supreme Court in this regard, and the findings so found and judgment awarded are res adjudicada, and, as pointed out in the defendant’s brief, this act of reference leaves said findings and judgment undisturbed. It is a familiar rule of law that courts will avoid in cases of doubt a decision holding a law of Congress unconstitutional. This rule obtains with especial significance as to inferior courts. A judgment nullifying an act of Congress is not to be treated otherwise than one of extreme importance. To so hold exacts convincing *502 reasons substantially free from doubt or uncertainty. Ann Arbor R. R. Co. v. United States, 281 U. S. 658. Therefore, we are of the opinion that the act of reference is this case is susceptible of a construction as congressional intention by special-legislation to procure certain facts to aid Congress in the exercise of a legislative function, which does not in any manner affect the finality of this court’s judgment in case No. J-543, and the motion to vacate and set aside this court’s reference of the matter to a commissioner of this court will be overruled. It is so ordered.
Williams, Judge; and LittletoN, Judge, concur.

 10 Stat. at Large, 612.

 lb.

 12 lb. 765.

 2 Wallace 561.

 14 Stat. at Large, 9.

 14 Stat. at Large, 44, 391, 444.

 Ex parte Russell, 13 Wall. 664.